***No. 05-1071 T***
***(Judge Susan G. Braden)***

---

***IN THE UNITED STATES COURT OF FEDERAL CLAIMS***

DANIEL D. PIERCE AND HENDY J. LUND,

Plaintiffs

v.

UNITED STATES,

Defendant

MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

EILEEN J.O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
STEVEN I. FRAHM
BENJAMIN C. KING, JR.
Attorneys
U.S. Department of Justice (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506
(202) 514-9440

---

**TABLE OF CONTENTS**

**Page**

Memorandum in Support of Defendant's Cross-motion for Summary Judgment And in Opposition to Plaintiffs' Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. *The stock options in issue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. *Income tax returns at issue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*1.* *Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*2.* *The 2000 return* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3. *The 2001 return and claim for refund* . . . . . . . . . . . . . . . . . . . . . . 7

II. Legal Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A. *Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. *The validity of Lund's §83(b) election is irrelevant to her 2001 regular income tax liability at issue in this case* . . . . . . . . . . . . . . 10

C. *In any event, the § 83(b) election was valid* . . . . . . . . . . . . . . . . . . . . . 12

D. *Section § 1211 applies to the AMT* . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Page**

## TABLE OF AUTHORITIES

**Cases :**

*Hernandez v. United States*, 2006 WL. 2620000 (C.D. Cal. 2006) . . . . . . . . . . . . . . . 2, 17

*Kadillak v. Commissioner*, 127 T.C. No. 13
2006 WL. 3208919 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 13, 14, 16, 17, 18

*Merlo v. Commissioner,* 126 T.C. 205 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17, 18

*Montgomery v. Commissioner*, 127 T.C. No 3
2006 WL 2472807 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17

*Norman v. United States*, 2006 WL. 2038264 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . 2, 16

*Palahnuk v. Commissioner*, 127 T.C. No. 9
2006 WL 2884449 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17, 18

*Pavlosky v. United States*, 2006 WL. 1867468 (Bankr., S.D.
Tex. 2006), *aff'd*, No. 06-CV-2061 (S.D. Tex., October 5, 2006) . . . . . . . . . . . . . 2, 16

*Spitz v. Commissioner*, T.C. Memo 2006-168,
2006 WL 2356125 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17, 18

**Statutes:**

Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085 . . . . . . . . . . . . . . . . . . . . . . . . 17

Internal Revenue Codes of 1986 (26 U.S.C.):

§ 53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

§ 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 10

§ 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

§ 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

**Page**

**Statutes (Continuation):**


§ 421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 10

§ 422 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

§4231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 1211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 15, 16, 17

§ 6511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


**Miscellaneous:**


S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Treas. Reg. § 1.55-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Treas. Reg. § 1.83-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Treas. Reg. § 1.83-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 13, 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1071 T

(Judge Susan G. Braden)

DANIEL D. PIERCE AND HENDY J. LUND,

Plaintiffs

v.

UNITED STATES,

Defendant

# MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The plaintiffs' complaint seeks a refund of $35,160.00 in tax paid with respect to their 2001 tax year. (Complaint ¶ 8.) Plaintiff Hendy Lund (hereinafter, "Lund") nevertheless confirms that the IRS has already refunded $27,774.00 to plaintiffs of the $35,160.00 they paid with respect to their 2001 tax year. (Lund Declaration Ex. K at 3.) Thus, the total amount actually at issue in this case is only $7,386.00. In their motion for summary judgment, plaintiffs advance two arguments for their claimed refund. Neither has any merit.

Plaintiffs' first argument is that Lund made an invalid election in 2000 under Section 83(b), of the Internal Revenue Code.[1] (P. Brief at 4-19.) As we explain below, the question of the validity of Lund's § 83(b) election in 2000 is irrelevant to whether plaintiffs are entitled to a refund for their 2001 tax year, the only issue before this Court. In any event, the Tax court recently rejected the arguments plaintiffs rely on here for the invalidity of the § 83(b) election in *Kadillak v. Commissioner*, 127 T.C. No. 13, 2006 WL 3208919 (2006).

Plaintiffs' other argument is that the $3,000.00 limitation on the deduction of long term capital losses in § 1211 does not apply to the Alternative Minimum Tax (hereinafter, "AMT"). (P. Brief at 19-32.) On that basis, they compute their AMT liability by claiming the full amount of the AMT long term capital loss they incurred in 2001, not just $3,000.00 of that loss. As set forth below, plaintiffs are wrong that the $3,000.00 limitation does not apply to the AMT. Indeed, their argument was recently rejected in the following cases, all involving substantially the same facts present here: *Palahnuk v. Commissioner*, 127 T.C. No. 9, 2006 WL 2884449 (2006), *Kadillak*, *Pavlosky v. United States*, 2006 WL 1867468 (Bankr., S.D. Tex. 2006), *aff'd*, No. 06-CV-2061 (S.D. Tex., October 5, 2006), *Hernandez v. United States*, 2006 WL 2620000 (C.D. Cal. 2006), *Merlo v. Commissioner*, 126 T.C. 205 (2006), *Norman v. United States*, 2006 WL 2038264 (N.D. Cal. 2006), *Spitz v. Commissioner*, T.C. Memo. 2006-168, 2006 WL 2356125 (2006), and *Montgomery v. Commissioner*, 127 T.C. No. 3 *Montgomery v. Commissioner*, 127 T.C. 3, 2006 WL 2472807 (2006).

---

[1]Citations to the Internal Revenue Code are to the provisions of 26 U.S.C. in effect in 2001, the year at issue in this case.

Plaintiffs' motion for summary judgment, therefore, should be denied, and the Court should enter summary judgment in favor of defendant, dismissing plaintiffs' suit for refund.

## I. FACTUAL BACKGROUND

### A. *The stock options in issue*.

During 1999-2001, Lund was an employee of Redback Networks, Inc. (hereinafter, "Redback"). (Lund Declaration ¶ 2.) Redback adopted a stock option agreement in 1997 under which it could grant incentive stock options to its employees . (Lund Declaration Ex. A.) Pursuant to that agreement, on January 4, 1999, Redback granted Lund an incentive stock option to purchase 15,000 shares of Redback stock, for $4.75 per share. (Lund Declaration Ex. B.) As a result of two stock splits, the number of shares subject to the option grant increased to 60,000, and the exercise price decreased to $1.1875 per share. (Lund Declaration ¶ 4, 5.)

The option grant provided that 25% of the shares, i.e. 15,000 shares, would vest on January 4, 2000, and an additional 1/48th of the shares, i.e. 1,250 shares, would vest on the fourth day of each month thereafter. (Lund Declaration Ex. B.) Lund had the right to exercise the option with regard to all the shares, even those shares which were not yet vested. The stock certificates for the non-vested shares on which options had been exercised were issued to Lund but were held in escrow by Redback until the vesting date. (Lund Declaration Ex. A, at 250.) In the event Lund's employment with Redback terminated before the vesting date, Redback had the right to repurchase the non-vested shares by paying Lund the exercise price. (Lund Declaration Ex. A, at 248.) However, Redback was not obligated to repurchase those shares and could let Lund keep them in spite of the termination of her employment. (Lund Declaration Ex. A, at 4-5.)

On March 2, 2000, Lund exercised her option with respect to 30,000 shares of Redback stock at the exercise price of $1.1875 per share. (Lund Declaration Exs. C, D.) Of those shares, 16,250 were immediately vested, as set forth in the exercise confirmation attached as Exhibit C to Lund's Declaration. The remaining 13,750 shares were not vested on March 2, 2000, as set forth in the exercise confirmation attached as Exhibit D to Lund's Declaration. All but 1,250 shares of the Redback stock subject to Lund's exercise of her option on March 2, 2000, were vested in 2000. (Lund Declaration ¶ 9.) The remaining 1,250 shares became vested on January 4, 2001. (Lund Declaration ¶ 9.)

The market value of the Redback shares on the date of the option exercise was $149.84 per share. (Lund Declaration Exs. C, D.) Therefore, the total value of the 30,000 shares Lund received through the March 2, 2000, option exercise was $4,495,320.00. Of this amount, $2,434,965.00, was the value of the 16,250 vested shares, and $2,060,355 was the value of the non-vested shares. The net amount realized by Lund on the option exercise, the market value of the stock less the exercise price paid, was $4,459,695.09. (Lund Declaration Exs. C, D.)

Lund executed an election pursuant to §83(b) with respect to the 13,750 non-vested shares she acquired through the March 2, 2000, exercise of her option. (Lund Declaration ¶ 7.) On October 16, 2000, Lund sold 11,000 shares of the Redback stock she obtained through the exercise of her incentive stock option, for $1,540,006.00. (Lund Declaration Ex. I at 3.) She sold the remaining 19,000 shares on April 10, 2001, for $303,984.87. (Lund Declaration Ex. J at 9.)

B. *Income tax returns at issue*.

1. *Introduction*.

Although the only tax year at issue in this case is 2001, a review of plaintiffs' 2000 tax return is necessary to understand some of the items reported on their 2001 return. It is also important to recognize that this case involves two types of tax - - the regular income tax imposed by § 61 and the AMT, imposed by § 56. In general, the AMT is the regular tax which is increased by denying the benefits of certain items identified in §§ 56 and 57. The stock options Lund exercised in 2000 were incentive stock options which qualified under § 422. (Lund Declaration Ex. B.) As provided in § 421(a), Lund realized no income in 2000 subject to the regular tax as a result of her exercise of the options, unless there was a disqualifying disposition of the stock in that year, as defined in § 421(b). However, § 421 is a tax preference item for purposes of the AMT. § 56(b)(3). Thus, for AMT purposes, the difference between the exercise price and the fair market value on the date of exercise would be included as a positive adjustment in calculating plaintiffs' 2000 AMT liability. Lund's basis in the stock for AMT purposes would then be the fair market value of stock on the date of exercise of the option, $149.84 per share. For regular tax purposes, however, her basis would be the $1.1875 per share exercise price.

To qualify for the regular income tax benefits under § 421, the taxpayer must hold the stock for a period of one year after the date the option is exercised. § 422(a)(1). If the stock is sold before the expiration of that one year period, the taxpayer must report ordinary income equal to the difference between the amount paid to exercise the option and the amount received in the sale. § 421(b). On October 16, 2000, Lund sold 11,000 shares of Redback stock she acquired

when she exercised the option on the March, 2, 2000. This sale was a disqualifying disposition, since it occurred less than 12 months after the March 2, 2000 option exercise.

2. *The 2000 return*.

Plaintiffs' 2000 return reported wages totaling $1,625,507.00. (King Declaration Ex. 1 at 1.) This amount included the $1,526,943.50 realized by Lund on the October 16, 2000, sale of 11,000 shares of Redback stock.[2] Since that stock was sold less than 12 months after Lund acquired the stock through the exercise of her incentive stock option, the sale of that stock was a disqualifying disposition pursuant to § 421(b), and the amount realized on that sale had to be included in ordinary income. Plaintiffs reported a regular tax liability of $674,453.00 on their 2000 return. (King Declaration Ex. 1 at 2.) Lund also made a § 83(b) election in 2000, to report as taxable all the stock on which she exercised an option on March 2, 2000, including the stock that had not yet vested.[3] (Lund Declaration ¶ 7.)

Plaintiffs reported an AMT liability of $620,213.00 on their 2000 return. (King Declaration Ex. 1 at 2.) In computing her AMT liability for 2000, Lund included $2,824,472, as a positive AMT adjustment on line 10 of her Form 6251. (King Declaration Ex. 1 at 12.) That amount was the difference between the fair market value of the unsold 19,000 shares of Redback stock she received through the exercise of her option, $149.84 per share, and the amount she paid

[2]Lund realized $1,576,943.50, because the proceeds of the sale were $1,540,006 and she paid $13,062.50 for the 11,000 shares at the $1.11875 per share option exercise price.

[3]Section 421 precludes *ab initio* the application of § 83 to the stock in issue for regular income tax purposes, and a § 83(b) election is therefore meaningless for regular income tax purposes. However, since § 421 does not apply to the AMT, in the absence of a § 83(b) election, § 83 would apply to the computation of plaintiffs' 2000 AMT liability.

to exercise the option with respect to those shares, $1.1875 per share.[4] (King Declaration Ex. 1 at 12.)

The AMT liability, combined with the regular tax liability, resulted in a total 2000 tax liability of $1,294,745.00. (King Declaration Ex. 1 at 2.) Plaintiffs did not file a claim for refund for their 2000 tax year, and that year is not before this Court.

3. *The 2001 return and claim for refund.*

Plaintiffs reported regular income of $228,269.00 on their 2001 return. (King Declaration Ex. 2 at 1.) They reported itemized deductions totaling $359,555, which consisted primarily of state taxes they paid for 2000. (King Declaration Ex. 2 at 2, 5.) Since the deductions exceeded their regular income, plaintiffs reported no regular tax liability for 2001. (King Declaration Ex. 2 at 2.) However, state taxes are a preference item for AMT purposes. § 56(b)(1). Since plaintiffs could not deduct the state taxes for AMT purposes, they reported an AMT liability of $35,160.00. (King Declaration Ex. 2 at 9.) This was the total tax liability they reported and paid for 2001. (King Declaration Ex. 2 at 2.)

On February 10, 2005, Lund filed a claim for refund of the $35,160.00 paid for her 2001 tax year. (Complaint ¶ 8.) The IRS audited that claim and realized that plaintiffs' 2001 return was not correctly prepared. Although Lund sold 19,000 shares of Redback stock on April 10, 2001, for $303,984.87, she did not report the gain on that sale for regular income tax purposes on schedule D, Capital Gains and Losses, attached to her 2001 return. The IRS determined that she

---

[4]The 11,000 shares sold on October 16, 2000, were not included in the computation of plaintiffs' 2000 AMT liability because the proceeds of that sale were reported as ordinary income.

had under reported her 2001 capital gains by the $281,422 gain on the sale of the 19,000 shares of Redback stock..[5]

These adjustments increased plaintiffs' adjusted gross income in 2001, which automatically decreased their itemized deductions by $5,322.00, and their exemptions by $4,408.00. (Lund Declaration Ex. K at 29-30.) As a result, the IRS determined that plaintiffs had a regular tax liability for 2001 in the amount of $30,174.00, not $0.00 as reported on the original return. (Lund Declaration Ex. K at 24.)

In addition, due to the increase in the plaintiffs' 2001 regular tax liability, the IRS determined that the correct tentative AMT liability was $7,386.00, rather than $35,160.00 reported on plaintiffs' 2001 original return. (Lund Declaration Ex. K at 36.) Since the tentative AMT liability was less than plaintiffs' $30,174.00 regular tax liability, the IRS determined that plaintiffs' had no AMT liability in 2001.[6] (Lund Declaration Ex. K at 37.)

Since plaintiffs' had regular income tax liability in 2001, they are entitled under § 53 against that liability, for any amounts paid as AMT in prior years. The amount of the credit is limited by § 53(c) to the difference between the amount of regular tax liability and the amount of tentative AMT for that year. The IRS determined that plaintiffs' regular tax liability in 2001 was

---

[5]This is the difference between the amount realized on the sale, $303,984.87, and the amount paid to exercise the option with respect to those shares, $22,562.00. (Lund Declaration Ex. K at 27.) The IRS also determined that dividend income should be increased by $996.00, because plaintiffs had failed to report dividends from Salomon Smith Barney and Proctor & Gamble. (Lund Declaration Ex. K at 26.)

[6]AMT is owed only to the extent the tentative AMT liability exceeds the taxpayer's regular income tax liability. § 56(a). The tentative AMT liability is the tax arrived at by multiplying the taxpayer's alternative minimum taxable income, computed in accordance with § 56 and 57, by the tax rate in § 56(b).

$30,174.00. (Lund Declaration Ex. K at 24.) The IRS determined that the amount of plaintiffs' tentative AMT for 2001 was $7,386.00. (Lund Declaration Ex. K at 34.) § 53(c). Therefore, the AMT credit available to offset plaintiffs' 2001 regular income tax was $22,788.00 (30,147.00 - 7,386.00). Applying the AMT credit left a regular tax liability of $7,386.00 for plaintiffs' 2001 tax. (Lund Declaration Ex. K at 24, 37-38.) This was the basis for the IRS allowance of $27,774.00, of the $35,160.00 refund claimed by plaintiff for 2001. (Lund Declaration Ex. K at 24.)

## II. LEGAL ARGUMENT

### A. *Introduction*

Section 83 provides that an individual will be taxed on the fair market value of property received in connection with the performance of services less any amount paid for the property. However, an individual is not taxed on property which is subject to a substantial risk of forfeiture until that risk is removed. § 83(a). Property is "transferred for purposes of section 83(b) when a taxpayer acquired a beneficial ownership interest in the property (disregarding any lapse restrictions)," including a lapse restriction that constitutes a substantial risk of forfeiture. *Kadillak*, 2006 WL 3208919 at 8; Treas. Reg. § 1.83-3(a)(1). A lapse restriction is any condition that might require the return of the property upon the happening of an event that is not certain to occur. *Kadillak*; Treas. Reg. § 1.83-3(a)(7), examples 1, 3. The presence of a lapse restriction, such as the requirement of continued employment, will not prevent there being a transfer for purposes of § 83, even though the property transferred is subject to a substantial risk of forfeiture. *Kadillak*.

Stock is property for purposes of § 83. *Kadillak*. Therefore, upon the exercise of a stock option, an individual is generally subject to tax on the difference between the value of the stock and the amount paid to exercise the option. However, if the stock is subject to a substantial risk of forfeiture, pursuant to § 83(a), the transfer of that stock is not subject to tax until the risk is removed. Section 83(b) allows taxpayers to elect to treat as subject to tax at the time of the option exercise all stock subject to the option, even if that stock is subject to a substantial risk of forfeiture. This allows the taxpayer to limit its tax liability to the value of the stock on the date of exercise (rather than a potentially higher future value).

In the case of incentive stock options that qualify under § 422(a), § 421(a) provides an exception to the general rule in § 83 that property transferred in exchange for services is subject to tax at the time of the transfer. Section 421(a) provides that with respect to incentive stock options, a taxpayer does not recognize income for regular income tax purposes either upon the granting of an incentive stock option, or the exercise of that option. The recognition of income is deferred until the disposition of the stock. § 421(a). However, section 421 does not apply to AMT. § 56(b)(3). Therefore, in computing an individual's AMT liability, § 83 governs the time when stock obtained through the exercise of an incentive stock option is subject to tax.

B. *The validity of Lund's § 83(b) election is irrelevant to h*er *2001 regular income tax liability at issue in this case.*

Lund elected pursuant to § 83(b) to have all 30,000 shares subject to the March 2, 2000, option exercise taxable on that date, including the 13,750 shares that had not yet vested. (Lund Declaration ¶ 7.) By making the election, Lund was ensuring that she would not be subject to ordinary income tax on any appreciation of the stock between the exercise and vesting dates.

Lund was gambling that the value of the Redback stock would continue to appreciate throughout 2000 and 2001.

Plaintiffs now argue that Lund's § 83(b) election was invalid. They claim there was no transfer under § 83 when she exercised the options on March 23, 2000, and, therefore, no operative § 83(b) election. (P. Brief at 5-19.) Plaintiffs argue that the transfer took place later, when the stock vested. (P. Brief at 19.)

Plaintiffs' argument is quite beside the point, as it has no effect on whether the plaintiffs are entitled to a refund for their 2001 tax year, the year at issue here. Of the 13,750 shares of stock that were not vested on March 2, 2000, all but 1,250 shares became vested in 2000. (Lund Declaration ¶ 9.) Even if Lund's § 83(b) election were invalid, plaintiffs would still have to report for AMT purposes in 2000 the difference between the value of the stock on the vesting dates in 2000 and the exercise price. Plaintiffs agree. (P. Brief at 19.) The difference in value between the vesting dates and the March 2, 2000 option exercise date would reduce plaintiffs' 2000 AMT liability.[7] Plaintiff's tax liability for 2000 is not at issue in this case, but, the reduction in the amount included in AMT in 2000 would reduce by the same amount the AMT long term capital loss plaintiffs incurred in 2001 on the sale of the stock. But that change still would not affect plaintiffs' 2001 regular income tax or AMT liability because, pursuant to § 1211, plaintiffs

[7]The vesting dates and fair market value of the stock on each of those dates is set forth in Lund's Declaration ¶ 9. For purposes of the Lund's 2000 AMT tax, with respect to the 13,750 non-vested shares, they included the difference between the value of those shares on March 2, 2000, $149.83 per share, and the $1.1875 exercise price, or $2,060,162.50. If the shares were not deemed to be transferred until the vesting dates, the total difference between the values on those dates and the exercise price would be $1,383,916.25. If the § 83(b) election were not valid plaintiffs' 2000 AMT liability would be reduced. However, plaintiffs' did not file a claim for refund for their 2000 tax year, and such a claim would now be precluded by the statute of limitations in § 6511.

could only use $3,000.00 of their AMT long term capital loss in computing their 2001 AMT liability. Therefore, the validity of the § 83(b) election is irrelevant to the question of whether plaintiffs are entitled to a refund of $7,386.00 for their 2001 tax year.

If Lund's § 83(b) election were invalid, it would affect plaintiffs' 2001 AMT tentative tax with respect to the 1,250 shares that vested on January 4, 2001. In the event the election was invalid, plaintiffs' would have to include as a positive adjustment on their 2001 Form 6251 (AMT), $51,015.63, which is the difference between the $42.00 per share fair market value of the 1,250 shares that vested in 2001, and the amount paid to exercise those shares. (Lund Declaration ¶ 9.) That adjustment would increase plaintiffs' 2001 AMT tentative tax by $12,753.90. Pursuant to § 53(c), that increase in the AMT tentative tax would reduce the amount of plaintiffs' AMT credit by a like amount. Therefore, if the § 83(b) election were invalid it would increase, not decrease, plaintiff's 2001 tax liability by $12,753.90.[8]

C. *In any event, the § 83(b) election was valid*.

Plaintiffs' claim the § 83(b) election was invalid on the basis that there was no transfer, as described in Treas. Reg. § 1.83-1(3)(a), of the non-vested stock when Lund exercised her option on March 2, 2000. (P. Brief at 6-7.) According to plaintiffs, non-vested stock is not transferred property for purposes of § 83 until the vesting date. (P. Brief at 19.) To the contrary, when Lund exercised her option, she acquired a beneficial interest in the 13,750 shares, which interest was subject only to the possibility that Redback might elect to repurchase some of those shares if her

---

[8]The AMT tax rate for 2001 was 25%. (King Declaration Ex. 2 at 9.) Therefore, an increase in the amount of AMT positive adjustments by $51,015.63, results in a $12,753.90 increase in tentative AMT. That increase would reduce the amount of AMT credit plaintiffs were entitled to in 2001 by $12,753.90, thereby increasing their 2001 regular tax liability by that amount.

employment terminated prior to the vesting dates set out in the option. Treas. Reg. § 1.83-3(a)(i) states that a transfer occurs when a person acquires a beneficial interest, disregarding lapse restrictions as defined in Treas. Reg. § 1.83-3(i).

Treas. Reg. § 1.83-3(i) defines a lapse restriction as a restriction other than a nonlapse restriction and includes a restriction that carries a substantial risk of forfeiture. Treas. Reg. § 1.83-3(h) defines a nonlapse restriction as a permanent limitation on the transferability of property that will require the transferee to sell or offer to sell the property at a price determined under a formula and that will continue to apply and be enforced against the transferee or any subsequent holder. In this case, the restriction on Lund's stock would expire each month as long as she remained employed. In fact, Lund did remain employed through January 4, 2001, and her interest in all the stock became fully vested. (Lund Declaration ¶¶ 2, 9.) Thus, the restriction on Lund's stock was not a permanent limitation on the transferability of that stock, and, therefore, was not a nonlapse restriction. Lund received a beneficial interest in stock when she exercised her options on March 2, 2000, and there was a transfer for purposes of § 83 on that date.

Plaintiffs nevertheless claim that Treas. Reg. § 1.83-3(a)(7), examples (3), (4), and (5), stand for the proposition that no transfer occurs when an employer has any right to repurchase shares at cost. (P. Brief at 15-18.) However, those examples are applicable only if property is "transferred under conditions that require its return upon the happening of an event that is <u>certain to occur</u>." *Kadillak*, 2006 WL 3208919 at 9; Treas. Reg. § 1.83-3(a)(3). The termination of Lund's employment during 2000 and 2001 certainly was not an event "certain to occur." in fact, it did not occur. Examples (3), (4), and (5) in Treas. Reg. § 1.83-3(a)(7) do not aid plaintiffs here. *Kadillak*.

Plaintiffs do not cite Example 1 of Treas. Reg. § 1.83-3(a)(7), which is instructive. In that example, return of the property was conditioned on sales reaching a particular level by a specified date. The example concludes that the restriction should be disregarded in determining whether a transfer occurred under § 83, because the restriction would lapse if a specific condition was satisfied by a particular date. Similar to example (1), Redback's contingent right to repurchase Lund's shares would lapse when Lund remained employed on a specific vesting date. As in example (1), Redback's contingent right to repurchase Lund's shares is a lapse restriction that is to be disregarded for purposes of determining whether a transfer occurred on March 2, 2000.

The Tax Court has rejected the same argument plaintiffs advance regarding the validity of Lund's § 83(b) election. *Kadillak, supra. Kadillak* involved facts almost identical to the facts here. The taxpayer there exercised incentive stock options with respect to stock that would not become vested until future dates. As in this case, in the event the employer terminated the taxpayer's employment, the employer had the right, not the obligation, to repurchase the non-vested shares at cost. The Tax Court held that the requirement that the taxpayer remain employed was a lapse restriction that did not prevent there being a transfer for purposes of § 83, and did not render a § 83(b) election invalid (2006 WL 3208919 at 8):

> Because the condition under which the petitioner was required to return the stock was not permanent, i.e., it was a lapse restriction, it was not certain that petitioner's services would be terminated before the stock vested. See Sec. 1.83-3(a)(7), *Example* (1) and (3), Income Tax Regs. The Ariba stock was not transferred on the date of exercise under a condition that was certain to occur. It follows that consideration of section 1.83-1(a)(5), Income Tax Regs., is unnecessary because the prerequisite condition is not satisfied. Accordingly, the stock was properly transferred to petitioner pursuant to section 83(b) when petitioner exercised option No. 117.

Since Redback's right to repurchase Lund's non-vested stock if her employment was

terminated was not certain to occur, that restriction is not taken into account in determining whether a transfer took place for purposes of § 83. Lund validly elected pursuant to § 83(b) to treat the 13,750 shares of non-vested Redback stock as taxable on the date the option was exercised, March 2, 2000.

D. *Section § 1211 applies to the AMT.*

Lastly, plaintiffs argue that they are entitled to utilize in 2001 all the AMT long term capital loss they incurred on their sale of Redback stock in that year based upon the contention that the $3,000.00 limitation in § 1211, on the amount of long term losses an individual can deduct, does not apply to the AMT calculation. Plaintiffs' argument has no merit.

Section 1211(b) broadly limits the long term capital losses that an individual taxpayer may deduct in any year to $3,000.00:

> (b) OTHER TAXPAYERS – In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of –
>
> (1) $3,000 ($1,500 in the case of a married individual filing a separate return), or
>
> (2) the excess of such losses over such gains.

Treas. Reg. § 1.55-1(a) provides that all Code provisions, unless otherwise provided, apply to the determination of AMT:

> Except as otherwise provided by statute, regulations, or other published guidance issued by the Commissioner, all Internal Revenue Code provisions that apply in determining the regular income of a taxpayer also apply in determining the alternative minimum taxable income of the taxpayer.

Nothing in § 1211 indicates it does not apply to the determination of income subject to AMT. Plaintiffs can not, and do not, cite any "statute, regulation, or other published guidance" providing

that § 1211 does not apply for AMT purposes. Therefore, § 1211(b) limits the use of any AMT long term capital loss by the plaintiff to an amount no greater than $3,000.00.

Indeed, every court that has addressed this issue has concluded that § 1211 applies to the AMT. In *Spitz* the Tax Court reached that conclusion, quoting legislative history (2006 WL 2356125 at 5):

> There are no provisions within Sections 55 through 58 and the accompanying regulations excluding capital loss limitations under section 1211(b) and 1212(b) from the calculation of an individual's AMTI. To the contrary, as explained by the Joint Committee on Taxation:
>
> > For most purposes, the tax base for the new alternative minimum tax is determined as though the alternative minimum tax were a separate and independent income tax system. In certain instances, the operation of the alternative minimum tax as a separate and independent tax system is set forth expressly in the Code. . . In other instances, however, where no such express statement is made, Congress did not intend to imply that similar adjustments were not necessary. Thus, for example, for [alternative] minimum tax purposes it was intended that section 1211 (limiting capital losses) be computed using the [alternative] minimum tax basis. (Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 438 (J. Comm. Print 1987).
>
> Therefore, the capital loss limitations of sections 1211(b) and 1212(b) apply in calculating a taxpayer's AMTI, and petitioner may not carry back the excess AMT capital losses recognized in 2001 and 2002, to reduce his AMTI in 1999, 2000, and 2001. See *Merlo v. Commissioner*, 126 T.C. 205, 212 (2006).

Accord, *Merlo*, 126 T.C. at 212, *Pavlosky*, 2006 WL 1867468 at 3, *Norman*, 2006 WL 2038264 at 6, *Kadillak*, 2006 WL 3208919 at 11, *Palahnuik*, 2006 WL 2884449 at 3.[9]

Notwithstanding this uniform case law, plaintiffs contend that the legislative history indicates that Congress did not intend § 1211 to apply to the AMT. Plaintiffs refer without specific citation to the Senate Explanation to the Tax Reform Act of 1986, P.L. 99-514. (P. Brief

---

[9]Counsel for the taxpayers in *Merlo, Spitz*, *Kadillak*, *Pavlosky*, *Montgomery*, *Nelson*, *Palahnuk,* and *Hernandez* is the same as plaintiffs' counsel here.

at 21.) The language plaintiffs refer to appears in Senate Report No. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1, at 521. But that language does not address whether the § 1211 capital loss limitation applies in computing AMT. 1986-3 C.B. (Vol 3) at 521-22. Rather it concerns the manner in which deferral provisions, such as accelerated depreciation, are to be handled for AMT purposes. 1986-3 C.B. (Vol. 3) at 521-22. There is no reference in Senate Report No. 99-313 (1986) to either § 1211, or the limitation on the deduction of long term capital losses for AMT purposes. 1986-3 C.B. (Vol. 3, at 515-528).

Indeed, the Tax Court in *Merlo*, 126 T.C. at 213, examined the legislative history that includes the portions plaintiffs rely on and concluded that it does not support their position.

> Petitioner relies on the Senate report to the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, as authority for the asserted congressional intent. See S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1. Petitioner does not offer a specific citation but instead cites to the Senate report generally. The Senate report addresses the AMT provisions on pages 515-540. *Id*. At 515-540, 1986-3 C.B. (Vol. 3) at 515-540. The Senate report does not directly support petitioner's interpretation of congressional intent, and we find no language supporting an inference of such intent. See *Id.* Therefore, we do not further consider petitioner's arguments based on his interpretation of congressional intent.

As noted by the Tax Court in *Spitz*, the only legislative history relevant to the question of whether § 1211 applies to the AMT is the Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986, at 438 [J. Comm. Print 1987]. The Joint Committee explanation expressly confirms that Congress intended that the § 1211 capital loss limitation <u>does</u> apply to the AMT. *Spitz.*

Plaintiffs also argue that they are entitled to an AMT NOL carry back. (P. Brief at 25-26.) However, the only year at issue here is 2001, the year in which the Redback stock was sold resulting in an AMT long term capital loss. Plaintiffs' argument that they are entitled to a carry back an AMT NOL from 2001 to some other tax year has no bearing on the only issue before this

court - - whether there was an overpayment in 2001. In any event, the argument plaintiffs advance here was specifically rejected in *Merlo*, 126 T.C. at 212-213, *Kadillak*, 2006 WL 3208919 at 11, *Spitz*, 2006 WL 2356125 at 5; *Norman*, and *Montgomery*.

CONCLUSION

For the reasons set forth above, defendant, the United States, respectfully moves this Court for judgment in its favor, dismissing the claims of plaintiffs, with prejudice.

Respectfully submitted,

s/Benjamin C. King, Jr.

BENJAMIN C. KING, JR.
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/Steven I. Frahm
Of Counsel

December 28, 2006



2122961.1