Source: My Sources > Taxation > Treatises & Analytical Materials > Federal > Tax Analysts > **Tax Analysts Tax Notes Today**
Terms: **karlinsky** (Edit Search | Suggest Terms for My Search)

Select for FOCUS™ or Delivery

*© 2006, Tax Analysts, Tax Notes Today, MAY 2, 2006*

Copyright © 2006 Tax Analysts
Tax Notes Today

**MAY** 2, 2006 TUESDAY

**DEPARTMENT:** News, Commentary, and Analysis; Special Reports

**CITE:** 2006 TNT 84-34

**MAGAZINE-CITE:** Tax Notes, May 1, 2006, p. 569;
111 Tax Notes 569 (May 1, 2006)

**LENGTH:** 12367 words

**HEADLINE:** 2006 TNT 84-34 THE 2000 DOT BOMB AND THE PROPER AMT TREATMENT OF INCENTIVE STOCK OPTIONS. (Section 55 -- Alternative Minimum Tax;) (Release Date: APRIL 17, 2006) (Doc 2006-7374)

**CODE:** Section 55 -- Alternative Minimum Tax;
Section 422 -- Incentive Stock Options

**ABSTRACT:** Stewart **Karlinsky,** San Jose State University, looks at the effect the alternative minimum tax and incentive stock options have had on dot-coms.

**SUMMARY:**

Published by Tax AnalystsTM

Stewart **Karlinsky** (karlin_s@cob.sjsu.edu) is the graduate tax director at San Jose State University.

This article presents an analysis of the appropriate treatment, for alternative minimum tax purposes, of stock from the exercise of an incentive stock option (ISO) when the value of the stock has declined below the exercise price and is subsequetly sold or becomes worthless. **Karlinsky** examines the legislative intent behind the AMT system in general and the ISO treatment in particular and finds that the application of the "economic income" concept to several generalizable scenarios demonstrates that the "negative adjustment" treatment is consistent with legislative intent while the capital loss treatment is not.

**AUTHOR: Karlinsky,** Stewart
San Jose State University

**GEOGRAPHIC:** United States

**REFERENCES:**
Subject Area:
 Alternative minimum tax;
 Benefits and pensions;

Individual income taxation;
Tax policy issues;
Tax system administration issues

**TEXT:**

The 2000 DOT Bomb and the Proper AMT Treatment of Incentive Stock Options

Release Date: APRIL 17, 2006

Published by Tax AnalystsTM

Stewart **Karlinsky** (karlin_s@cob.sjsu.edu) is the graduate tax director at San Jose State University.

This article presents an analysis of the appropriate treatment, for alternative minimum tax purposes, of stock from the exercise of an incentive stock option (ISO) when the value of the stock has declined below the exercise price and is subsequetly sold or becomes worthless. **Karlinsky** examines the legislative intent behind the AMT system in general and the ISO treatment in particular and finds that the application of the "economic income" concept to several generalizable scenarios demonstrates that the "negative adjustment" treatment is consistent with legislative intent while the capital loss treatment is not.

* * * * *

Table of Contents

I. Introduction

II. Congressional Intent

III. Adjustments vs. Preferences

IV. Economic Income

V. Economic Analysis Scenarios

A. Scenario I

B. Scenario II

C. Scenario III

VI. Alternative Minimum Tax Net Operating Loss

VII. Other Reflections and Rationales

A. Statute and Committee Reports

B. Section 83

C. Reg. Section 1.55-1

D. Arrowsmith Doctrine

E. Skelly Oil Co.

F. Tax Benefit Rule

VIII. Conclusion

I. Introduction

To use a phrase popularized by Federal Reserve Chair Alan Greenspan, the heated stock market in general and the astronomical stock prices of dot-com companies in particular exhibited "irrational exuberance" in the late 1990s and early in 2000. After stock prices reached a peak in March 2000, we have seen a dramatic fall and a more recent sideways movement. This stock market phenomenon has had a negative effect on employees who received and exercised stock before and during 2000 and who held the stock beyond the year of exercise, as encouraged by legislation and the incentive stock option (ISO) tax rules. The serious tax problem faced by employees at all levels (from CEOs and board chairs to administrative assistants and maintenance workers) is the alternative minimum tax effect in the exercise year (positive AMT adjustment) versus the sale in a subsequent year (negative adjustment or capital loss treatment) when the stock has fallen to a price less than the exercise price or is worthless, and therefore, the employee has little or no proceeds from the stock's sale.

This article will address the congressional intent behind the AMT system, and concludes that the proper treatment of the subsequent-year loss should be a negative ordinary AMT adjustment -- not a capital loss -- up to the point at which the selling price does not go below the grant price. Only if the selling price is below the grant price will it be appropriate to use the section 1211 capital loss to apply for that difference.

That negative adjustment would lead to an alternative tax net operating loss under sections 56(d) and 172. Only AMT preferences are limited by their effect on regular tax NOLs (see section 56(d)(2)(A)(ii)). Adjustments are specifically allowed (see section 56(d)(2)(A)(i)) to create, increase, or decrease the regular taxable income to arrive at the section 56(d) AMT NOL. Further, under reg. section 1.172-3(a)(3)(i) the loss should be treated as a business loss. Therefore, the negative adjustment may create an AMT NOL for the tax year of the negative adjustment, and a two-year carryback/1/ under sections 56(d) and 172 should likewise be allowed. If the year that the loss arose was 2001 or 2002, a 100 percent offset against AMTI in the carryback year is permitted, rather than the normal 90 percent limitation. Also, because the loss is related to the taxpayer's trade or business (of being an employee), the deduction should not be limited to nonbusiness income, in accordance with reg. section 1.172-3(a)(3)(i). Therefore, the carryback claim will generate a tax refund, and correspondingly will reduce or eliminate the minimum tax credit (MTC) carryforward to future years.

The proper characterization of this negative AMT adjustment can be taken from several sources including: congressional committee reports, Treasury and IRS guidance, and the Supreme Court's Arrowsmith doctrine, the theory underlying the tax benefit rule. As will be shown below, the negative adjustment should be the same character as the positive ordinary adjustment, and not a capital loss, for AMT purposes.

II. Congressional Intent

The courts clearly consider the legislative intent behind the law. For example, Judge David Laro's opinion in Allen v. Commissioner/2/ states that "analysis begins with the relevant statutory text. We interpret that text with reference to the legislative history primarily to learn the purpose of the statute and to resolve any ambiguity in the words contained in the

text." I find that the intent of the congressional committee reports strongly favors the negative adjustment treatment.

When the old (1969-1986) add-on minimum tax was repealed and the earlier version of the individual AMT was modified by the 1986 Tax Reform Act (TRA '86; P.L. 99-514), a new tax system was enacted that applied equally to individuals and corporations. The rationale behind both the old systems/3/ and this new tax system was to tax "economic income" sooner rather than later. This intent is borne out by language in the Senate committee report that states that "the Committee believes that the minimum tax should serve one overriding objective: to ensure that no taxpayer with substantial economic income can avoid significant tax liability by using exclusions, deductions and credits."/4/ The congressional goal to tax economic income is echoed in the legislative history of repealing the add-on minimum tax system because the old system inadequately addressed the tax avoidance problem in that "the present minimum taxes on both individuals and corporations do not sufficiently approach the measurement of economic income."/5/

III. Adjustments vs. Preferences

The AMT system disallows the use of some permanent benefits (AMT preferences) such as private activity bond interest and itemized tax deductions, and it delayed some tax deductions (depreciation) or accelerated some income items such as ISO spread at exercise (collectively labeled AMT adjustments). Congress intends for the AMT adjustments to accelerate the payment of taxes for those with significant economic income, but the adjustments should not create additional tax liability.

The distinction between an AMT preference or adjustment is interesting, and relevant to our analysis. A preference would only increase taxable income, and the basis of the asset would not be increased under this alternative system. An adjustment would increase or sometimes decrease taxable income, and the basis of the related asset would reflect those changes as well. For example, if accelerated over straight-line depreciation was treated as a preference, the excess would be included in minimum taxable income, but no decrease (negative adjustment) would be allowed in future years when straight-line exceeded accelerated depreciation. Also, when the asset was sold, the regular tax basis would be used for both regular tax and minimum tax purposes to measure the gain or loss on the sale.

On the other hand, if depreciation is treated as an adjustment, then in the earlier years, the excess of accelerated depreciation over straight line depreciation would be a positive adjustment, and in future years the straight line over accelerated depreciation would be a negative adjustment. Also, the basis of the asset for regular tax purposes would be lower than the basis for minimum tax and would result in a different gain or loss. It is not unusual to have recognized gain for regular tax purposes and loss for minimum tax purposes.

Another important distinction between adjustments and preferences is the effect on the NOL provisions. An AMT NOL is computed taking into account adjustments, in accordance with section 56(d)(2)(A)(i). However, preferences may only reduce the NOL, and only to the extent that they increased the regular tax NOL./6/ Because the AMT ISO treatment is an adjustment, it is appropriate to compute the section 172 NOL with adjustments provided for in sections 56 and 58. Also, a tax preference is meant to be a permanent increase in tax liability since, for individuals, no MTC/7/ carryforward is created. On the other hand, adjustments are meant to be timing or temporary in nature, and they do result in an MTC.

The original ISO minimum tax preference was defined in section 57(a)(6)/8/ as the spread between exercise date fair market value and the grant price paid for the stock. The spread would be taxed only if capital gains inured to the exercised stock. Thus, if a disqualifying disposition occurred relative to the stock options, no minimum tax preference was created. In 1982 it was moved to section 57(a)(10). In 1986 it was redesignated and amended as

section 57(a)(3), but remained a tax preference. The latter change kept its status as a preference, but gave it one characteristic of an adjustment -- the increase in stock basis for the preference amount.

In 1988 the tax law converted the ISO preference into an AMT adjustment. That change implies that a positive or negative adjustment should be permitted. The change was necessary in part because the 1986 tax act changed the treatment of disqualifying dispositions. For earlier years (1969-1986 inclusive), if the taxpayer got the benefit of capital gain treatment on the sale of the exercised stock, then Congress wanted the earlier-year spread to be subject to minimum tax. If the spread did not give rise to capital gain treatment, no preference was triggered. That treatment changed in 1986, and only if the stock sold in the year of exercise was the quasi-preference/9/ eliminated. In effect, TRA '86 moved to taxing economic income regardless of subsequent character.

The AMT adjustment concept of accelerating the recognition of economic income, but not creating additional income or tax liability, is reinforced by the section 56(b)(3) ISO spread at exercise. That is because the Technical and Miscellaneous Revenue Act of 1988 amended the ISO AMT preference (section 57) to its current provision as an AMT adjustment (section 56), a timing/temporary item. As discussed above, a principal difference between an AMT preference and an AMT adjustment is that the former is an add-on permanent item that will only increase AMTI and will therefore increase total tax liability; the latter is a timing item that increases AMTI in an earlier period and turnaround in a later period, but doesn't create additional total tax liability.

IV. Economic Income

One obvious issue in examining Congress's intent in enacting the AMT system is what is economic income. In the corporate AMT arena, the law specifically defines what Congress had in mind because it enacted the book untaxed reported profits regime (section 56(f)) for 1987 through 1989, and the adjusted current earnings (ACE) (section 56(g)) subsystem for 1990 on.

As to individuals, economic income was not specifically or statutorily defined. Therefore, the courts have long held that you should look to the plain English definition or its common usage to determine the meaning. The classic economics definition of income is usually attributed to Haig-Simons/10/ as "consumption plus or minus change in net worth/wealth." The adjustment (and former preference) for the ISO exercise spread is clearly an increase in net worth/wealth at the measurement date (exercise), so including it in AMT computation is consistent with the congressional intent to tax some prescribed economic income earlier. That is reaffirmed in Estate of Gresham,/11/ in which the difference between FMV and option price was ruled to be economic income. Similarly, when the value of the stock declines and you have a different realization event (a sale of the exercised stock), the taxpayer's economic income has declined (net worth decreased), and under the congressional intent/12/ should reduce AMT in the same manner that it increased under the Haig-Simons economic income definition.

Another way to analyze the character issue and the symmetrical way it should be treated is to examine the positive adjustment under section 56(b)(3). That positive adjustment is not a capital gain for AMT purposes, or else individuals could use their regular tax capital losses against this positive adjustment and one could try to tax it at the 20 percent/15 percent capital gain rates. Given that, why should the subsequent negative adjustment be treated as anything other than a reversal of the former positive adjustment, fully offsettable against other AMT adjustments or preferences, including other section 56(b)(3) ISO exercise adjustments by the taxpayer in the current year? For example, if an individual taxpayer exercised stock in Year 1 with a $ 100,000 adjustment, and in Year 3 had a negative AMT adjustment on those shares of $ 40,000, but also exercised other ISOs in Year 3 for a

positive adjustment of $ 25,000, wouldn't the positive adjustment from the exercise be offsettable by the negative adjustment from the sale? Although there are no cases or rulings on the issue, based on the congressional intent of better measuring economic income, as well as fairness and equity, an offset should be allowed. That would reaffirm that the year of sale negative adjustment would not be capital in nature to the extent of the originating-year positive adjustment.

Table 1
Hypothetical regular tax liability

| | Year 1 | Year 2 | |
|---|---|---|---|
| | $ 1 million | $ 1 million and | $ 300,000 LTCG |
| | x 38% | x 38% | x 20% (10,000 x $ 40-$ 10) |
| Total Tax | $ 380,000 | $ 380,000 | $ 60,000 |
| Liability | $ 380,000 [1] Plus | $ 440,000 [2] = | $ 820,000 |

Editor's Note: Numbers followed by [1] and [2] are calculated in this table.

Table 2
Alternative: Negative AMT adjustment treatment

| | Year 1 AMT | Year 2 AMT |
|---|---|---|
| | $ 1 million | $ 1 million |
| | + $ 1 million ($ 110-$ 10 x 10,000) | - $ 700,000 ($ 40-$ 110 x 10,000) |
| Total | $ 2 million | $ 300,000 |
| | x.28 | x .28 |
| AMT | $ 560,000 | $ 84,000 |
| Regular Tax | $ 380,000 [1] | $ 440,000 [2] |
| MTC | + $ 180,000 | - $ 180,000 |
| Tax Due | $ 560,000 Plus | $ 260,000 = $ 820,000 same as regular tax |

Editor's Note: Numbers followed by [1] and [2] are calculated in Table 1.

That matching of positive and negative AMT adjustments is consistent with the tax law treatment of adjustments because section 56(b)(3) provides that if the exercise and sale occur in the same year, the AMT adjustment is limited to the section 422(c)(2) rules -- essentially the gain on the disposition of the stock. That implies that the negative and positive adjustments are of the same character or else the numbers couldn't be netted. Another way to view the rule is that it is illogical for two adjustments to have the same character if recognized in the same year, but different characters if recognized in different years. That interpretation of the relevant tax provisions is also consistent with congressional intent regarding ISOs in that Congress wanted to "provide an important incentive device for corporations to attract new management and to retain the service of executives who might otherwise leave."/13/

V. Economic Analysis Scenarios

As will be demonstrated, if negative adjustments and positive adjustments have the same character, the intent of Congress in enacting the AMT system relative to the goal of properly reflecting economic income for temporary/timing differences will have been better met. This article looks at a hypothetical regular tax that would be imposed on economic income, without the AMT system in place, and then compares that tax liability with the results of the

AMT being imposed under the two alternatives: negative adjustment or capital loss treatment. To the extent the same total tax is due, it is paid over the same time frame, and the AMT results in taxes being due in an earlier year, this treatment would seem to best reflect congressional intent.

In Scenarios I and II, the economic income for the two years in our hypothetical example is basically two years of salary of $ 1 million per year for a total of $ 2 million, plus the sale of 10,000 shares of stock, exercised in Year 1 at $ 10 per share and sold in Year 2 at $ 40 per share, for a long-term capital gain of $ 300,000. Thus, the total economic income for this taxpayer is $ 2,300,000. The AMT treatment that matches economic income would be the one that is consistent with congressional intent. That should be the total economic income reflected under the regular tax system as well as the AMT system; however, under the AMT system, some of the income and its related tax liability would be recognized in an earlier year. As will be shown below, the negative ordinary adjustment alternative best reflects this concept.

In Scenario III, the hypothetical taxpayer again earns $ 2 million in wages for the two years, but loses $ 60,000 on the sale of 10,000 shares of ISO stock that were purchased for $ 10 per share and sold at $ 4 per share. Economic income would be $ 1,940,000 ($ 2 million - $ 60,000 loss). Negative ordinary treatment of the loss again results in an exact match with the economic income concept, but the tax is due in an earlier year, which is again consistent with congressional intent in enacting the AMT system.

A. Scenario I

Let us take as an example an individual taxpayer who has $ 1 million in compensation in each year, receives a grant of 10,000 ISOs in Year 0 at $ 10 per share; exercises the options in Year 1 when the share price is $ 110 per share, and in Year 2 sells the stock for $ 40 per share in a qualified disposition. Assume that the ordinary tax rate is 38 percent, the capital gains rate is 20 percent, and the AMT rate is 28 percent (which are in fact the approximate rates in the years under study). Table 1 reflects the hypothetical tax liability of $ 820,000, of which $ 380,000 is owed for Year 1 and $ 440,000 for Year 2. Table 2 reflects AMT negative adjustment treatment.

Thus, treating the two AMT adjustments symmetrically (positive and negative AMT adjustment) results in a tax liability consistent with Congress's intent in that income tax is paid earlier on economic income, but the total tax liability does not change. That is, the AMT system results in $ 560,000 in Year 1 and $ 260,000 in Year 2 for a total tax liability over the two-year period of $ 820,000. The hypothetical regular tax on income would have been $ 380,000 in Year 1 and $ 440,000 in Year 2, also for a total tax liability of $ 820,000.

Note that two treatments under the minimum tax system are necessary to match congressional intent: one, the minimum tax credit allowed the $ 180,000 tentative minimum tax (TMT) over the regular tax for Year 1, and is created only by adjustments, to be carried to the next year and offset regular tax, not to go below the minimum tax of the next year; and two, the treatment of the decrease in value of the ISO stock disposed of will be a negative adjustment. The latter requirement will be best illustrated in the next alternative in which MTC still applies, but the negative adjustment is not treated symmetrically.

Table 3
Alternative: AMT capital loss adjustment treatment

| Year 1 | Year 2 |
|---|---|
| AMT | AMT |
| $ 1 million | $ 1 million |
| + $ 1 million ($ 110-$ 10 | - $ 3,000 ($ 40-$ 110 |
| ______________ x 10,000) | _________ x 10,000) |

| | | |
|---|---|---|
| | $ 2 million x .28 | $ 997,000 x .28 |
| AMT | $ 560,000 | $ 279,160 |
| Regular Tax | $ 380,000 [1] | $ 440,000 [2] |
| MTC | + $ 180,000 | - $ 160,840 |
| Tax Due | $ 560,000 plus | $ 279,160 = $ 839,160 |

In addition two carryovers are created:

| | |
|---|---|
| MTC carryover | $ 19,160 [$ 180,000 - $ 160,840] |
| Capital loss carryover | $ 697,000 [$ 700,000 - $ 3,000] |

Editor's Note: Numbers followed by [1] and [2] are calculated in Table 1.

Let us now compare the treatment under an AMT capital loss adjustment assumption (see Table 3) in which the section 1211 $ 3,000 capital loss limitation applies to the Year 2 AMT loss.

If a capital loss regime was imposed on the negative adjustment, then for the same two years, different taxes are due ($ 839,160 vs. normative tax of $ 820,000) and two carryovers are created -- a minimum tax credit of $ 19,160 that may be applied to Year 3 and later years, and a capital loss carryover of $ 697,000 that may be used against AMT capital gains and up to $ 3,000 of ordinary AMTI in future years. The assumption of a capital loss regime is inconsistent with congressional intent in that there are different total tax liabilities for the two years as well as multiple carryovers to future years that will further complicate the tax system. Thus, the result of capital loss treatment adds unnecessary complexity to the tax system, complexity that Treasury has stated in T.D. 8569 should be minimized. Capital loss treatment also does not reflect economic income, which has been stated as the congressional goal of the minimum tax system.

The conclusion of the first scenario reflects the fact that if the negative adjustment is treated as symmetrical to the positive adjustment, the total AMT tax and the total regular tax would be the same for the same two years, but, consistent with congressional intent, the AMT liability reflects economic income by taxing it earlier.

B. Scenario II

If a system works, the same treatment should hold up under extreme as well as simple fact patterns. Therefore, a second more extreme but realistic example (which is closer to the facts of many taxpayer's situations) should be instructive in examining how congressional intent of better taxing economic income is met by treating the negative adjustment for AMT purposes in the same manner as the positive adjustment, or as an AMT capital loss adjustment. Note that the total tax of $ 820,000 is the same in Scenarios I and II because the total economic income of $ 2,300,000 is the same -- that is, $ 1 million wages in Years 1 and 2 and income from the ISO stock of $ 300,000 [10,000 shares times selling price of $ 40 and cost of $ 10 per share].

Let us take essentially the same fact pattern as in Scenario I, except the value of the stock on the date of exercise will be $ 210 rather than $ 110, to examine the effect of an AMT NOL carryback relative to the regular tax liability. That is, an individual taxpayer has $ 1 million in compensation in each year, and is granted 10,000 ISO stock options in Year 0 at $ 10 per share; the individual exercises the options in Year 1 when the share price is $ 210 per share and sells them in a qualified disposition in Year 2 when the sales price is $ 40 per share (see Tables 4, 5, and 6). Also assume the same tax rates as above: The ordinary tax rate is 38

percent, the capital gain rate is 20 percent, and the AMT rate is 28 percent.

Table 4

Hypothetical regular tax liability

| | Year 1 | Year 2 | Total |
|---|---|---|---|
| Earned Income | $ 1 million | $ 1 million | $ 2 million |
| Capital Gain | $ 0 | $ 300,000 ($ 40-$ 10 x 10,000) | $ 300,000 |
| Taxable Income | $ 1 million | $ 1.3 million | $ 2.3 million |
| Regular Tax Liability | $ 380,000 [1] | $ 440,000 [2] [20% x 300,000 + $ 1 million x 38%] | |
| Total Regular Tax Liability for Both Years | | | $ 820,000 |

Editor's Note: Numbers followed by [1] and [2] are calculated in Table 1.

Table 5

Alternative: Negative AMT adjustment treatment

Step #1

| | Year 1 | Year 2 |
|---|---|---|
| Earned Income | $ 1 million | $ 1 million |
| AMT ISO Adjustment ($ 210 - $ 10) x 10,000 shares | $ 2 million | ($ 1.7 million) ($ 40-$ 210 x 10,000) |
| AMT Income | $ 3 million | ($ 700,000) AMT NOL carryback |
| TMT | $ 840,000 [3] [$ 3 million x.28] | $ 0 |
| Regular Tax | $ 380,000 [1] | $ 440,000 [2] |
| MTC C/O to Year 2 | $ 460,000 [$ 840,000 - 380,000] | |
| Owe the Government on Original Return for Year 1 | $ 840,000 [3] | |
| Owe the Government on Original Return for Year 2 | $ 440,000 [2] | |
| Carryback Claim Benefit | - $ 196,000 [4] | |
| MTC Carryover to Year 2 Used | - $ 264,000 [5] | |
| Net Tax Owed for Two Years | $ 820,000 | |

Step #2

AMT NOL Carryback Claim Computation:

| | |
|---|---|
| Year 1 AMTI Before Carryback Claim | $ 3 million |
| AMTNOL Carryback Year 2 to Year 1 | ($ 700,000) |
| AMTI Year 1 | $ 2.3 million |
| TMT | $ 644,000 [$ 2.3 million x .28] |
| Regular Tax | - $ 380,000 [1] |
| MTC | $ 264,000 [5] usable in Year 2 since TMT is zero in Year 2 |

$ 840,000 (Carryback Claim Benefit Year 1 Tax Before Carryback) - $ 644,000 (Year 1 Tax After Carryback) = $ 196,000 [4] (Refund -- no interest on carryback claim).

Editor's Note: Numbers followed by [1] and [2] are calculated in

Table 1.

Editor's Note: Numbers followed by [3], [4], and [5] are calculated in this table.

Summary: Once again, using negative adjustment treatment, total tax for the two years is the same as the hypothetical regular tax, but it is paid earlier under the AMT system. In effect, the taxpayer would have normally paid $ 380,000 in Year 1 and $ 440,000 in Year 2. After the AMT NOL carryback, tax in Year 1 tax would be $ 644,000 [$ 840,000 - $ 196,000] and in Year 2, $ 176,000 [$ 440,000 - $ 264,000], for a total tax liability for both years of $ 820,000 and no carryovers to Year 3. Thus, even after the carryback, the tax paid in the earlier year was $ 644,000 rather than the Year 1 regular tax of $ 380,000, which is consistent with congressional intent to tax significant economic income earlier.

However, using a capital loss treatment model, this total tax liability -- $ 1,119,160 -- does not add up to the same result as the regular tax liability -- $ 820,000 -- nor is the same economic income reflected in this alternative scenario. That again provides support for the use of the symmetrical treatment of negative and positive AMT adjustments vis-a-vis capital loss treatment to better satisfy congressional intent.

C. Scenario III

Now take the facts in Scenario II and change one factor, the Year 2 selling price to $ 4 per share, to demonstrate that part negative adjustment and part section 1211 capital loss treatment may exist in the AMT world (when the selling price is below the grant price). That appropriately taxes economic income; the taxes are just owed in an earlier year for AMT purposes which is consistent with Congress's intent in enacting the AMT system.

Table 6
Alternative: AMT capital loss adjustment treatment

| | Year 1 | Year 2 |
|---|---|---|
| Earned Income | $ 1 million | $ 1 million |
| AMT ISO | + $ 2 million | - ($ 3,000) capital loss |
| AMT Income | $ 3 million | $ 997,000 |
| TMT | $ 840,000 [3] [$ 3 million x .28] | $ 279,160 [4] [$ 997,000 x .28] |
| Regular Tax | $ 380,000 [1] | $ 440,000 [2] |
| Owe: Higher of the Two | $ 840,000 | |

This creates a $ 460,000 MTC [$ 840,000 - $ 380,000]

| | |
|---|---|
| MTC Year 2 utilization | ($ 160,840) |
| Year 2 regular tax | $ 279,160 [4] |
| MTC c/o to Year 3 | $ 299,160 |

Result of AMT Capital Loss Adjustment Treatment:

| | |
|---|---|
| Year 1 | $ 840,000 [3] |
| Year 2 | + $ 279,160 [4] |
| Total Tax | $ 1,119,160 |

Future Years Potential Benefits:

MTC C/O to Year 3 $ 299,160

AMT Capital Loss Carryover $ 1,697,000 against AMT capital gains and $ 3,000 AMTI/year

Editor's Note: Numbers followed by [1] and [2] are calculated in Table 1.

Editor's Note: Numbers followed by [3], [4], and [5] are calculated in Table 5.

Table 7
Hypothetical regular tax computation

| | Year 1 | Year 2 |
|---|---|---|
| Earned Income | $ 1 million | $ 1 million |
| Capital loss | $ 0 | ($ 3,000) |
| | | [($ 4 - $ 10) x 10,000 shares, ($ 60,000)] |
| | $ 997,000 limited to ($ 3,000) and no NOL | |
| | x .38 | x .38 |
| Regular Tax | $ 380,000 [1] | $ 378,860 [2] = |

Total Tax $ 758,860 Plus $ 57,000 Capital Loss Carryover (C/L C/O)

Editor's Note: Numbers followed by [1] and [2] are calculated in Table 1.

Editor's Note: Numbers followed by [3], [4], and [5] are calculated in Table 5.

Thus, the aggregate income for both years is $ 2 million in salary plus a loss of $ 60,000 (10,000 shares purchased at $ 10 and sold at $ 4 per share) on the sale of stock. That resulted in a total tax liability of $ 758,860 and a capital loss carryover of $ 57,000.

Conclusion: Assuming symmetrical treatment of ISO negative adjustment, total tax liability is $ 560,000 in Year 1 (after the AMT NOL carryback is reflected) and $ 198,860 in Year 2, for a total tax liability of $ 758,860 -- the same total tax liability as the regular tax, but with payments due earlier under the AMT system. The same capital loss carryover of $ 57,000 is also created under the regular hypothetical and this negative adjustment scenario.

Thus, with this extreme but common consequence of the "irrational exuberance bubble" for the 2000-2002 time frame, using a negative adjustment regime is consistent with the economic income concept endorsed by Congress in enacting the AMT system. However, using a capital loss assumption results in a widely different scheme: an effective two-year tax that affects and complicates future years' tax liabilities.

VI. Alternative Minimum Tax Net Operating Loss

Section 56(d) was enacted at the same time as the AMT regime in 1986 and specifically allows adjustments/14/ to the regular tax NOL deduction for AMT adjustments (section 56(d)(2)(A)) and to a limited extent by AMT preferences to compute the AMT NOL.

Table 8
Alternative: Negative AMT adjustment treatment

| | Year 1 | Year 2 |
|---|---|---|
| Earned Income | $ 1 million | $ 1 million |
| ISO | $ 2 million | ($ 2 million) |
| C/L | $ 0 | ($ 3,000) C/L C/O $ 57,000 |

| | | |
|---|---|---|
| Taxable Income/AMTI | $ 3 million | ($ 1 million) AMT NOL C/B |
| TMT | $ 840,000 [$ 3 million x .28] | $ 0 |
| Regular Tax | $ 380,000 [1] | $ 378,860 [2] |
| | | - $ 180,000 MTC utilization [3] |
| | | $ 198,860 |

Step #2 Carryback the AMT NOL to Year 1 and Modify the MTC

MTC Without Carryback $ 460,000 [$ 840,000 - $ 380,000]
Year 1 W/AMT NOL C/B
$ 3 million
- $ 1 million

$ 2 million

TMT $ 560,000 [$ 2 million x .28]
Regular Tax $ 380,000 [1]

MTC After Carryback $ 180,000 [3]
Total Tax Year 1 $ 560,000
Year 2 $ 198,860

$ 758,860

Editor's Note: Numbers followed by [1] and [2] are calculated in Table 1.

Editor's Note: Numbers followed by [3], [4], and [5] are calculated in Table 5.

That subsection states that the regular tax NOL (section 172(c)) "shall be determined with the adjustments provided for in this section (56) and section 58." Given the very different treatment of adjustments from preferences, it is significant that in 1988, the AMT ISO exercise treatment was changed from a preference (section 57) to an adjustment (section 56 (b)(3))./15/ It is also significant that the committee report discusses the treatment of the AMT ISO adjustment as simply a matter of different timing./16/ That is, for AMT purposes, the exercise date spread will be included in income under the rules of section 83 in the earlier year and in regular taxable income, but not AMT, in the subsequent year. That is reinforcing the congressional intent that for adjustments, economic income is being properly reflected through the AMT system, but no difference in treatment is appropriate because it is purely a timing issue. This is borne out by the language of the committee report when it says that if the exercise and sale are done in the same tax year, the tax treatment would be the same. The report discusses the timing difference if the years are different (Year 1 AMT inclusion, Year 2 regular tax), but does not discuss a change in the treatment of the AMT ISO adjustment. It is also clear from the committee report that the treatment is dictated by section 83, which covers employee compensation. The AMT NOL rules clearly state that because the section 56(b)(3) transaction is an adjustment, the section 172(c) NOL computation is to be determined by reflecting this adjustment.

Table 9
Alternative: AMT capital loss adjustment treatment

| | Year 1 | Year 2 |
|---|---|---|
| Earned Income | $ 1 million | $ 1 million |
| ISO | + $ 2 million | - $ 3,000 |
| | $ 3 million | $ 997,000 plus AMT C/L C/O |

$ 2.057 million
Regular tax C/L C/O $ 57,000
TMT $ 840,000 [$ 3 million x .28] $ 279,160 [$ 997,000 x .28]
Regular Tax $ 380,000 [1] $ 378,860 [2]
MTC Utilization - $ 99,700

$ 279,160 MTC
C/O $ 360,300
to Year 3

MTC $ 460,000
Summary Using
C/L Treatment
Year 1 $ 840,000
Year 2 + $ 279,160

Total $ 1,119,160 plus $ 2.057 million AMT C/L C/O and regular tax C/L C/O $ 57,000 and
$ 360,300 MTC C/O vs. regular cumulative two-year tax
$ 758,860 plus $ 57,000 C/L C/O.

Editor's Note: Numbers followed by [1] and [2] are calculated in Table 1.

Editor's Note: Numbers followed by [3], [4], and [5] are calculated in Table 5.

It might be argued that sections 172(d)(2) and (d)(4) limit the determination of the AMT NOL. That seems to be an incorrect argument for several reasons. First, the AMT NOL rules of section 56(d) trump those rules and allow the determination to include adjustments but not preferences. Second, as is reflected in the legislative intent discussed above, Congress did not intend for the subsequent year to have a different treatment than the prior year. Because the prior year had no capital gain, the subsequent-year loss would not be treated for AMT purposes as a capital loss. That would obviate the application of 172(d)(2). Third, it is clear from reg. section 1.172- 3(a)(3)(i), other regulations,/17/ court opinions,/18/ and long-standing Treasury rulings/19/ that the employee compensation is trade- or business-related. Therefore, the negative adjustment is a business deduction and is not limited by section 172 (d)(4).

VII. Other Reflections and Rationales

A. Statute and Committee Reports

Unfortunately, there is nothing directly on point statutorily as to the proper character treatment of this negative AMT adjustment. As mentioned above, TRA '86 did modify the ISO rules to allow this preference to increase its AMT basis. The conference committee report goes on to discuss an example in which the selling price is greater than the exercise price. No discussion of a loss situation or the character of a loss is presented in the committee report. However, if you look to the Senate committee's "overall structure" of the new AMT system, for deferral preferences (adjustments), minimum tax deductions may exceed regular tax deductions to ensure that basis will be fully recovered under both the regular and minimum tax systems./20/ The negative adjustment treatment would seem to fit this rationale to the structure of the AMT system.

Further, when there is an absence of direct authority, reasoning by analogy and inferring from similar situations are normally used to arrive at a tax position. The economic analysis exhibited above strongly supports the use of a symmetrical negative adjustment to meet

congressional intent to tax economic income earlier. Also, the committee report for the Technical Corrections Act of 1988, which moved the ISO treatment from a preference to an adjustment, explicitly discusses the timing issue and implies the same treatment in different years. Again, the committee report implicitly assumes that the selling price will be greater than the exercise value. That is evidenced by the language of the 1988 technical correction to AMT (section 1007 of the act) in which the AMT ISO preference was moved to an adjustment. The report states that "if the stock is disposed of in a disqualifying disposition in a subsequent taxable year, the spread . . . will be included in AMTI in the first taxable year and in taxable income (but not AMTI) in the subsequent taxable year." That may occur only if the selling price is greater than the exercise value. Hence, Congress must have been looking only at the increase in value hypothetically, but it is not the case in this taxpayer's situation.

For the AMT, which is viewed as a parallel tax system to that of the regular tax, the adjusted basis of the stock is increased by the AMT ISO adjustment./21/ The conference committee report gives an example that reflects this in the amount of the gain. The character of the adjustment or the gain is not discussed in the committee reports, nor is the potential treatment of losses even mentioned. For example, if the taxpayer had a $ 100,000 capital loss in Year 3 or as a carryover to Year 3, would the positive adjustment be treated as a capital gain for AMT purposes? I think not; that would be a difficult position to support, especially since there was no sale or exchange. Thus, the character of the positive adjustment is not capital in nature. As shown above in discussing congressional intent to reflect economic income, and as seen below in the discussion of the Arrowsmith doctrine, this distinction is important.

Looking at congressional intent when the statute is silent is not unique to the AMT ISO situation. For example, a relatively long- standing letter ruling (LTR 9101005) deals with the confluence of section 115 and the AMT. A nonprofit cooperative liability insurance pool was formed to protect municipalities, local governments, and public agencies. The income earned was exempt from tax under section 115, but it was potentially subject to AMT. The ruling held that even though the pool's income was clearly included in earnings and profits, it should not be included in adjusted current earnings to calculate AMTI. If the income was included in adjusted current earnings, it would subject 75 percent of the income to AMT liability. Basically, even though the plain language of the statute would require inclusion of the income in AMTI, the letter ruling nonetheless looked to the intent of Congress in ruling that the income was not included in adjusted current earnings.

Similarly, TAM 9841007,/22/ which deals with transitioning from the old individual AMT system (pre-1987) to the new AMT system (post-1986), looks to the logic and intent of Congress for similar situations in holding that the transitioning from 1986 to 1987 rules requires the foreign tax credits and the overall foreign loss (OFL) to start with the regular tax FTC and OFLs. Similarly, this article argues that the intent of Congress as to ISOs warrants a negative adjustment rather than capital loss treatment.

The statute is silent as to the proper AMT treatment, and applying the "second walk-through" approach/23/ is a position often adopted by the service in numerous rulings, TAMs, and so forth. For example, the areas of section 381, depletion expense, and cooperative and patronage dividends have all been ruled on even though there was no explicit authority in the statute.

B. Section 83

It has been argued that there are other situations in which a taxpayer may have both ordinary income and a capital loss, so why is this situation different? For example, if an employee elects section 83(b) to include as ordinary compensation income the value of any discount inherent in the receipt of property for services when there are substantial risks of forfeiture, the later forfeiture is not deductible at all (section 83(b)(1)(B)). That is simply the

congressionally intended penalty for the potential ability to convert future appreciation into long-term capital gains, and it is written into the law regarding the section 83(b) election. In the area of incentive or qualified stock options (specifically excluded from section 83 by sections 83(e)(1) and (e)(3)), the intent of Congress was to encourage employees and executives to hold on to exercised stock over the long term. Therefore, the congressional intent behind AMT ISO treatment is different than the section 83(b) election.

Similarly, if the section 83(b) stock was sold at a loss, that loss would be capital in nature. Several court cases make it clear that Arrowsmith v. Commissioner/24/ doesn't apply to those situations because the compensation element is not related back to, or is not an integrated related development to, the change in value of the stock./25/ If the sale and loss of value both happened in the same year, ordinary income and capital loss would still be the result. In the ISO situation, Arrowsmith applies because the transactions are integrated, as discussed below. Also, the legislative history of the ISO area shows that Congress intended to reward employees for investing their time and efforts in their corporate employers through higher share prices.

An issue that might be asserted by the chief counsel is that reg. section 1.83-7(a) applies to ISOs that are treated for AMT purposes as not subject to section 421. The regulation states: "If section 83(a) does not apply to the grant of such an option because the option does not have a readily ascertainable FMV at the time of grant, sections 83(a) and 83(b) apply to the transfer of property pursuant to such exercise." Section 83 does not apply to the AMT ISOs, the plain language of the statute supports this: "Statutory construction begins with the plain text and if that text is unambiguous, it usually ends there as well."/26/ I believe that section 83 and reg. section 1.83-7 do not apply to the AMT ISO positive adjustment because at date of exercise, whether the options have an ascertainable FMV determination is irrelevant; they are included because of section 56(b)(3). Thus, if the option was allowed to be exercised before it had an ascertainable FMV, it would still be an AMT adjustment under section 56(b)(3).

Further, these rulings and section 424(c)(3) conclude that if the exercise was implemented in the fairly common cashless exercise technique, as discussed in Rev. Rul. 80-244/27/ and LTR 9629028/28/ (with mature stock from a previous ISO stock option exercise, nonqualified offering stock, or market-purchased stock), section 1036 applies, which would mean that section 83 and reg. section 1.83-7(a) would not be applicable according to reg. section 1.83-8(b)(6).

Another reason I do not believe reg. section 1.83-7 applies is that the logical extension of its application is that the employer would be entitled to a compensation deduction under section 83(h) for AMT purposes, assuming that proper W-2 disclosures were made under reg. section 1.83-6. That would result in huge AMT corporate refunds for high-technology and other companies/29/ and would emasculate the corporate AMT system. That is unlikely to have been Congress's intent in 1986 when it enacted section 83(b)(3) and the rest of the AMT system to raise revenue.

C. Reg. Section 1.55-1

Reg. section 1.55-1,/30/ which was issued eight years after the AMT was enacted, makes it clear that except for individual AGI computations, the AMT parallel-world concept is applied using the provisions of the code. In effect, you recalculate your AMT liability by running the taxable income computation through the tax law provisions, but on an AMT basis. Thus, the treatment of some items is stated in the law, while the treatment of others is applied using the heuristics of applying the tax law, but on an AMT basis./31/

For example, section 58(b) prescribes the rules that apply to the intersection of AMT and passive activity losses. However, there are other situations that are not explicitly stated. The

recalculation concept -- which is sometimes called the separate, independent, parallel theory/32/ -- must be applied to those areas. For example, it is clear from T.D. 8569 that a corporation would compute its AMT section 170(b)(2) charitable contribution limitation by including section 56 and 57 adjustments and preferences in computing the appropriate AMTI for the 10 percent taxable income limitation. This would include the ACE adjustment and adding back the 80 percent dividends received deduction. Similarly, the accumulated adjustment amount (AAA)/33/ of an S corporation is the accumulated taxable income that has been previously taxed but does not include tax-exempt income. If the corporation invested in private activity bonds or had a different depreciation deduction for the AMT than for regular tax, then the company would have to compute an AMT AAA to determine the taxability and character of distributions to its shareholders for AMT purposes. In the same vein, a shareholder's adjusted basis in S corporation stock or debt may be different for regular tax purposes than for AMT purposes. Therefore, the section 1366(d) loss limitations would have to be separately computed. The IRS and Treasury have issued numerous pronouncements/34/ on the proper AMT treatment of non-explicitly-stated items that cite committee reports and the 1986 Blue Book on the separate and parallel nature of the AMT system.

In fact, the number of rulings has been so extensive that the judge's comments made in Rauenhorst v. Commissioner/35/ come to mind: "We cannot agree that the Commissioner is not bound to follow his revenue rulings in Tax Court proceedings." The judge goes on to cite Phillips:/36/

> Respondents' position in this case directly contradicted his long-standing and clearly articulated administrative position set forth. . . . Respondent's counsel may not choose to litigate against the officially published rulings. . . . The result of contrary action is capricious application of the law.

Given the number of rulings, regulations, committee reports, and Blue Book analyses that espouse the separate but parallel nature of the AMT system, it should be difficult for the commissioner to sustain in court that the negative adjustment's treatment should be a capital loss.

D. Arrowsmith Doctrine

In Arrowmith, the facts are relatively simple. Two shareholders liquidated a corporation in Year 1 and recognized a capital gain. In Year 5, because of shareholder transferee liability, they were required to pay some expenses of the liquidated corporation. The shareholders took an ordinary deduction for the outlays, and the Supreme Court held that the expenditures related back to the capital gain recognized and therefore was a capital loss. The Court stated that although there is a required accounting period, some events are so integrated with a prior transaction that the latter should look to the former for guidance as to its character. The justices noted that if the two events had occurred in the same year, the payment would have reduced the amount of reported capital gains; therefore, the loss was related back to the capital gain and must be characterized as a capital loss.

Since 1952, many cases have cited the Arrowsmith doctrine to determine that when the character of a gain or loss in a subsequent year is integrated, related back, or has nexus to the prior-year event, its character is determined by the character of the prior events.

E. Skelly Oil Co.

Another Supreme Court case, Skelly Oil,/37/ has an interesting twist on this doctrine in that it deals with the amount, rather than the nature, of an item. Skelly had received income that was eligible for a oil depletion allowance of 27-1/2 percent. In effect, the includable income

was only 72-1/2 percent (100 percent - 27-1/2 percent depletion allowance). In a future year, the company was forced to repay some of the income. The company deducted 100 percent of the payments, but the Supreme Court held that the deduction related back to the income earned and that only 72-1/2 percent of the expenditures was deductible.

In a series of 16(b) short-swing-profit cases from courts of appeals in the late 1960s and early 1970s,/38/ the Arrowsmith doctrine was applied to refer back to a subsequent payment to the capital gain sale and make the character of the repayment a capital loss. Each of the director/shareholders argued that the payment was made to protect their business reputation and therefore should be an ordinary deduction. The Tax Court agreed with the taxpayer, but three different circuits overruled the lower court and held that the payment was a capital loss under Arrowsmith, since it was integrated with the gain on the sale of stock.

The Senate Committee Report to the Technical and Miscellaneous Revenue Act of 1988 (discussing that act's section 1007) strengthened the argument that the year of sale for regular tax is related back to the year of exercise inclusion for AMT. That is because the report discusses the two events being related to each other.

It is also instructive to note that Notice 2004-28/39/ does not include the logic of Arrowsmith as one of the notice's meritless or frivolous tax return positions.

F. Tax Benefit Rule

It may also be argued that under the tax benefit rule, the character of the loss should not be subject to section 1211 because the positive adjustment it relates back to is not a capital gain. However, Treasury has not issued any AMT tax benefit regulations in the past 19 years, and section 59(g) allows, but does not require, Treasury to issue those regulations. As we have seen in Hillman,/40/ even though it may be argued that the Treasury is causing a harsh and unjust result by not issuing regulations on a timely basis to make the tax law fairer, not issuing regulations is within Treasury's discretion. Interestingly, the House committee report discussing the tax benefit rule's applicability to the AMT reiterates that the "regular and minimum taxes generally are computed separately."/41/

VIII. Conclusion

The congressional intent behind the AMT system was to ensure that substantial economic income was not avoided by various deferrals, deductions, and credits, and that it would be taxed earlier rather than later. As to the specific adjustment under discussion -- ISOs -- Congress wanted to balance the intent to encourage long-term holding of employer stock and the avoidance of paying tax on economic income for 5, 7, or even 10 years. Therefore, this AMT adjustment resulted in a positive AMT adjustment in the year of exercise and a corresponding negative adjustment in the year of sale, when the value of the asset and hence the net worth subsequently decreased. Thus, the negative AMT adjustment treatment is far superior in meeting the intent of Congress, which courts have traditionally looked at as a crucial factor in making their rulings.

Further support for the taxpayer's position that the negative adjustment should be the same character as the positive adjustment is that the IRS has used the Arrowsmith doctrine in several revenue rulings, GCMs, and TAMs/42/ to relate a subsequent event's character back to an earlier event in which the two are integrated or have nexus. The guidance also discuss, as Arrowsmith does, what would have happened if both events had occurred in the same year. In our ISO situation, if both events had occurred in the same year, there would have been no AMT adjustment required. Therefore, it is logical that under the Arrowsmith doctrine, the net effect of the second event should be regarded as the same character as the initial event. That would lead to the conclusion that the negative adjustment (up to the amount of the positive adjustment) should not be a capital loss, since the positive adjustment was not a

capital gain. That conclusion is consistent with the short-swing-profit cases discussed above. It would also create an NOL carryback.

The negative AMT adjustment is the appropriate treatment in that the total tax under the normative tax scenario matches the actual tax liability in the same group of years.

FOOTNOTES

/1/ Or, at the taxpayer's election, five years, because the Job Creation and Worker Assistance Act of 2002 enacted a five- year carryback if the loss arises in 2001 or 2002.

/2/ 118 T.C. 1 (2002), Doc 2002-456, 2002 TNT 4-5.

/3/ See McDonald v. Commissioner, 764 F.2d 322 (5th Cir. 1985), for analysis of the original (1969) legislative introduction of the minimum tax system and the need to better reflect economic income.

/4/ S. Rep. No. 313, 99th Cong. 2d Session, 518 (1986), P.L. 99-514; see also Allen, supra note 2, which cites the committee reports as to congressional intent to tax economic income earlier, and Snap Drape Corp., 105 T.C. 16 (1995), aff'd, 98 F.3d 194, Doc 96-29056, 96 TNT 213-8 (5th Cir. 1996). See also other recent AMT cases: Ventas, Inc. v. United States, 381 F.3d 1156, Doc 2004- 17088, 2004 TNT 165-4 (Fed. Cir. 2004); and Sequa Corp. v. United States, 350 F. Supp.2d 447, Doc 2004-20213, 2004 TNT 206-12, (S.D.N.Y. 2004), aff'd, 437 F.3d 236, Doc 2006-2283, 2006 TNT 25-45 (2d Cir. 2006).

/5/ S. Rep. No. 313, 99th Cong., 2d Sess. 519 (1986)

/6/ See section 56(d)(2)(A)(ii) and flush language immediately thereafter.

/7/ See section 53(d)(1)(B).

/8/ Internal Revenue Code of 1954.

/9/ It is a quasi-preference because no negative adjustment was allowed, but the stock basis was allowed to be increased for minimum tax purposes.

/10/ Wikipedia discusses Haig-Simons as the definition for economic income as equal to consumption plus change in wealth. A search in Yahoo for Haig-Simons yields 33,600 hits; the first 10 are university economic sites that are discussing economic income in terms of Haig-Simons. A Google search for Haig-Simons yields 788 references to Haig-Simons.

/11/ 55 AFTR2d 85-667 (10th Cir. 1985). Other places where economic income is discussed in the context of individuals is section 469 PAL and the designation of an activity as being better able to measure economic income. In the corporate setting, it is used to suggest that earnings and profits approximates economic income and that ACE is supposed to approximate that also. Two other cases that use Haig-Simons to define economic income are Bealor v. Commissioner, T.C. Memo. 1996-435, Doc 96-26285, 96 TNT 189-16; and Collins v. Commissioner, T.C. Memo. 1992-478.

/12/ In McDonald, supra note 3, the judge cited the 1969 legislative history of the add-on minimum tax, the forerunner of the current AMT system, and noted that the House bill referred to economic income five times and that the Senate looked to the goal of taxing economic income three times.

/13/ S. Rep. 97-144, p. 98 (July 6, 1981).

/14/ That the code specifically mentions adjusting the regular tax NOL by adjustments distinguishes our situation from such cases as Allen, Ventas, and Sequa, in which the argument about how far to take the concept of a separate but parallel tax system comes into play.

/15/ See section 1007(b)(14)(A) of the Technical and Miscellaneous Revenue Act of 1988 and the accompanying Senate committee report.

/16/ See, e.g., TRA '86 committee reports, discussing section 701 of that act, in which the Senate explanation says that "adjustments are permitted in order to reflect the fact that certain deferral preferences (such as accelerated depreciation) cannot be treated simply as add-ons if total income is to be computed properly over time. For such preferences, the minimum tax deduction may exceed the regular tax deduction, thus insuring that the basis will be fully recovered under both the regular and minimum tax systems."

/17/ Reg. sections 1.421-6(f) and 1.162-7.

/18/ See Bagley v. Commissioner, 85 T.C. 663 (1985), in which section 421-type options were received for services. When a potential merger was proposed, the target company bought back the stock options before they were exercised. It was held that the income was compensatory in nature to the taxpayer because the transaction was not covered by section 421, even though the options were qualified options originally.

/19/ Rev. Rul. 73-146, 1973-1 C.B. 61; GCM 35102; Rev. Rul. 67-366, 1967-2 C.B. 165; LTR 9326001, 93 TNT 141-18.

/20/ Senate Finance Committee report to Act [TRA '86] Section 701 AMT for Individuals and Corporations Structure, which was adopted by the conference report.

/21/ See section 701(a) of TRA '86.

/22/ Doc 98-30057, 98 TNT 197-20.

/23/ TAM 9720005, Doc 97-13405, 97 TNT 96-16.

/24/ 344 U.S. 6 (1952).

/25/ Slater v. Commissioner, 64 T.C. 571 (1975); FSA 1999-498, Doc 1999-851, 1999 TNT 11-100.

/26/ United States v. Gayle, 342 F.3d 89, 92 (2d Cir. 2003); see also Allen, supra note 2.

/27/ 1980-2 C.B. 234.

/28/ Doc 96-20548, 96 TNT 142-27.

/29/ The ability to deduct this item as a compensation expense for AMT purposes is supported by Rev. Rul. 2001-1, 2001-1 C.B. 726, Doc 2001-1975, 2001 TNT 13-8.

/30/ T.D. 8569, Doc 94-10510, 94 TNT 230-3.

/31/ See General Explanation of the Tax Reform Act of 1986 (Blue Book), Joint Committee on Taxation, 99th Congress, 438, which discusses the fact that sometimes the rules are explicitly stated and other times they are not, but the intent of Congress was to apply them whether they are explicitly stated or not. The Blue Book then cites as examples section 265 expenses, which may become deductible on an AMT basis; section 263A (UNICAP) as applied

on an AMT basis for AMT purposes, and section 1211 capital loss limitation as applied to the AMT but reflecting AMT gains and losses.

/32/ Another term for this that the taxpayer prefers is the "second walk-through" approach as discussed in TAM 9720005, in which the income tax law is applied to the same facts but on an AMT basis. In the last few years, three courts have questioned the scarcity of legislative history, Blue Book explicit statements, and over 17 years of IRS and Treasury rulings that the AMT system is a parallel tax system. See Allen, Ventas, and Sequa. However, the conference report regarding section 701 of TRA '86 specifically refers to "the parallel nature of the regular tax and the minimum tax systems,"; the legislative history of section 59 (g) tax benefit enactment affirms the separate and parallel nature of the AMT system; and the HR Conference (vol.2) Rep. No. 841, 99th Congress, 2d Session, 262 (1986), deals with the separate but parallel nature of AMT relative to foreign tax credit carryovers. Also, reg. section 1.56(g)-1(a)(5) states that the IRS believes that Congress generally intended the AMT system and the adjusted current earnings systems to be separate from, and parallel to, the regular tax system.

/33/ Section 1368(e)(1) defines AAA.

/34/ For example, TAM 200044003, Doc 2000-28293, 2000 TNT 215-11, discusses the application of section 381(c)(1)(B) to the AMT as well as to regular tax NOLs, even though there is no explicit authority in the statute; TAM 199931040 (Doc 1999-26180, 1999 TNT 152-23) and TAM 9747002 (Doc 97-31802, 97 TNT 56- 22) as well as LTR 9804056 (Doc 98-3896, 98 TNT 16-29), LTR 9650003 (Doc 96-32203, 96 TNT 243-26), LTR 9652005 (Doc 97-5, 96 TNT 252-7), and LTR 9931040 (Doc 1999-26180, 1999 TNT 152-23) apply depletion rules based on an AMT-adjusted basis even though there is no explicit authority in the statute; LTR 9712017 (Doc 97-8217, 97 TNT 56-22), LTR 9409004 (94 TNT 44- 13), and TAM 9610001-3 (Doc 96-7101, 96 TNT 49-35; Doc 96-7102, 96 TNT 49-36; Doc 96-7103, 96 TNT 49-37) all deal with cooperatives and patronage dividend rules. They hold that the rules of section 1381 are applied on an AMT basis for AMT purposes even though there is no explicit authority in the statute; LTR 9841007 (Doc 98-30057, 98 TNT 197-20) applies the AMT rules to the overall foreign loss rules, and LTR 9101005 applies the parallel concept to section 115, even though there is no explicit authority in the statute.

/35/ 119 T.C. 157, Doc 2002-22803, 2002 TNT 195-13 (2002). See also Dover Corp. and Subsidiaries, 122 T.C. 324, Doc 2004-9660, 2004 TNT 88-15 (2004), for dicta about the fact that the commissioner can't hold a long- standing position and change it in court when convenient.

/36/ 88 T.C. 529 (1987).

/37/ 394 U.S. 678 (1969).

/38/ Cummings v. Commissioner, 506 F.2d 449, (2d Cir. 1974), rev'g 61 T.C. 1 (1973); Anderson v. Commissioner, 480 F.2d 1304 (7th Cir. 1973), rev'g 56 T.C. 1370 (1971); and Mitchell v. Commissioner, 428 F.2d 259, (6th Cir. 1970), rev'g 52 T.C. 170, cert. denied, 401 U.S. 909 (1971).

/39/ 2004-16 IRB 783, Doc 2004-6771, 2004 TNT 60- 17.

/40/ 263 F.3d 338, Doc 2001-11146, 2001 TNT 76- 7 (4th Cir. 2001), rev'g 114 T.C. 103, Doc 2000- 6046, 2000 TNT 41-17 (2000).

/41/ H. Rep. No. 841, 99th Congress, 2d Sess. II-262-3 (1986).

/42/ See, e.g., Rev. Rul. 79-278, 1979-2 C.B. 302; GCM 37943; and Rev. Rul. 67-331, 1967-

2 C.B. 290.

END OF FOOTNOTES

**************** End of Document ****************

Source: My Sources > Taxation > Treatises & Analytical Materials > Federal > Tax Analysts > **Tax Analysts Tax Notes Today**
Terms: **karlinsky** (Edit Search | Suggest Terms for My Search)
Mandatory Terms: **date from 04/05/2006**
View: Full
Date/Time: Thursday, October 5, 2006 - 10:52 PM EDT

LexisNexis® About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.