# In the United States Court of Federal Claims

No. 05-1071T
Filed: May 31, 2007
**TO BE PUBLISHED**

| | | |
|---|---|---|
| DANIEL D. PIERCE and HENDY J. LUND, Plaintiffs, v. THE UNITED STATES, Defendant. | * | Alternative Minimum Tax Adjustment, 26 U.S.C. § 56(d)(2)(A)(i); Alternative Minimum Tax Net Operating Loss Deduction, 26 U.S.C. § 56(d)(2); Capital Loss , 26 U.S.C. §§ 1211, 1212; Net Operating Loss, 26 U.S.C. § 172; Section 83(b) Election, 26 U.S.C. § 83(b); Summary Judgment, RCFC 56(c); Tax Refund, 26 U.S.C. §§ 6511, 7422, 6532, 28 U.S.C. § 1346(a)(1). |

**Don Paul Badgley**, Badgley-Mullins Law Group, Seattle, Washington, and **Brian G. Isaacson**, Merriam & Isaacson, P.S., Seattle, Washington, counsel for Plaintiffs.

**Benjamin C. King, Jr.**, United States Department of Justice, Tax Division, Washington, D.C., counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN, *Judge.***

Plaintiffs are among a number of employee-taxpayers that exercised incentive stock options and paid the Alternative Minimum Tax ("AMT")[1] at discounts during the robust stock market of the late 1990s and early in 2000. Subsequently, when the market declined, Plaintiffs incurred significant capital losses when they exercised those options. To offset the AMT due, Plaintiffs requested that the Internal Revenue Service ("IRS") include these capital losses as a negative AMT adjustment and allow Plaintiffs to carry back excess losses to prior tax years. Plaintiffs' request was rejected. Plaintiffs then filed a Complaint in the United States Court of Federal Claims requesting a refund allegedly due if Sections 172(c) and (d) and Section 1211 of

[1] Congress allows a taxpayer that exercises an incentive stock option to defer recognition of income for regular tax purposes, however, the taxpayer may incur tax liability under the AMT. *See* 26 U.S.C. § 56(b)(3).

the Internal Revenue Code ("IRC")[2] do not apply to AMT capital losses, when calculating an AMT adjustment, and if Plaintiffs' March 8, 2000 Section 83(b) election to tax non-vested stock options was invalid. As discussed herein, these same issues previously have been considered in the United States District Courts, the United States Tax Court, and the United States Court of Federal Claims.

## I. RELEVANT FACTS. [3]

In 1997, Redback Networks, Inc. ("Redback") adopted a Stock Option Agreement to grant employees incentive stock options. L. Ex. A. On January 13, 1999, Redback granted

---

[2] "Section" references herein are to the IRC.

[3] The relevant facts recited herein were derived from: the October 7, 2005 Complaint ("Compl."); the United States ("Government")'s January 3, 2006 Answer; the February 27, 2006 Joint Preliminary Status Report ("JPSR"); the Government's May 31, 2006 Status Report ("GSR"); Plaintiffs' November 6, 2006 Motion for Partial Summary Judgment ("Pl. Mot.") and Annex thereto ("Pl. Mot. Annex 1-2"); Plaintiffs' November 6, 2006 Proposed Findings in Support ("Pl. PF"); the October 27, 2006 Declaration of Hendy J. Lund ("Lund Decl.") and Exhibits thereto ("L. Ex. A-K"); the October 31, 2006 Declaration of Brian G. Isaacson ("Isaacson Decl. I") and Exhibits thereto ("I. Ex. A-T"); the Government's December 28, 2006 Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Gov't Mot."); the Government's December 28, 2006 Proposed Findings in Support ("Gov't PF"); the Government's December 28, 2006 Response to Plaintiffs' Proposed Findings ("Gov't PF Resp."); the December 28, 2006 Declaration of Benjamin C. King, Jr. ("King Decl.") and Exhibits thereto ("K. Ex. 1-3"); Plaintiffs' January 29, 2007 Response to the Government's Cross-Motion and Reply to the Government's Opposition ("Pl. Resp."), together with the January 29, 2007 Declaration of Brian G. Isaacson ("Isaacson Decl. II) and Exhibits thereto ("Ex. A-1-A-13"); Plaintiffs' January 29, 2007 Response to the Government's Proposed Findings ("Pl. PF Resp."); the Government's February 15, 2007 Reply ("Gov't Reply"); and the May 10, 2005 Oral Argument ("TR 1-69") and Exhibits ("O. Ex. 1-4").

Plaintiff Ms. Hendy J. Lund ("Lund") an option[4] to purchase 15,000 shares of Redback stock for $4.75 per share. L. Ex. B.

As a result of stock splits on August 20, 1999 and April 4, 2000, the number of shares subject to the option increased to 60,000, but the exercise price decreased to $1.1875 per share. *See* Lund Decl. ¶¶ 4, 5. The January 13, 1999 option also provided that 25% of the shares, *i.e.*, 15,000 shares, would vest on January 4, 1999, and an additional 1/48th of the shares, *i.e.,* 1,250 shares, would vest on the fourth day of each month thereafter. L. Ex. B. Lund had the right to exercise an option, even though all shares were not vested. *Id.; see also* L. Ex. A at 1. Non-vested stock, on which an option was exercised, was held by Redback in escrow until the vesting

[4] Section 422(b) of the IRC defines an "incentive stock option" as:

> an option granted to an individual for any reason connected with his employment by a corporation, if granted by the employer corporation or its parent or subsidiary corporation, to purchase stock of any of such corporations, but only if--
>
> (1) the option is granted pursuant to a plan which includes the aggregate number of shares which may be issued under options and the employees (or class of employees) eligible to receive options, and which is approved by the stockholders of the granting corporation within 12 months before or after the date such plan is adopted;
>
> (2) such option is granted within 10 years from the date such plan is adopted, or the date such plan is approved by the stockholders, whichever is earlier;
>
> (3) such option by its terms is not exercisable after the expiration of 10 years from the date such option is granted;
>
> (4) the option price is not less than the fair market value of the stock at the time such option is granted;
>
> (5) such option by its terms is not transferable by such individual otherwise than by will or the laws of descent and distribution, and is exercisable, during his lifetime, only by him; and
>
> (6) such individual, at the time the option is granted, does not own stock possessing more than 10 percent of the total combined voting power of all classes of stock of the employer corporation or of its parent or subsidiary corporation.

26 U.S.C. § 422.

date, in the event that Lund's employment terminated prior to that time. L. Ex. B at 4, 6. In such an event, Redback had the right to repurchase non-vested stock by paying Lund the exercise price. *Id.* at 4-5. Redback, however, was not obligated to repurchase any stock and Lund could retain any stock previously acquired, even if her employment was terminated. *Id.* In addition, if Lund wanted to sell or transfer stock to a third party, Lund was required to notify Redback, which had the right of first refusal. *Id.* at 6.

On March 2, 2000, Lund exercised an option for 16,250 shares of vested stock at $1.1875 per share, for $19,296.88. L. Ex. C (Confirmation of Exercise); *see also* Lund Decl. ¶ 5. On the same day, Lund also exercised an option for 13,750 shares of non-vested stock at $1.1875 per share, for $16,328.13. L. Ex. D; *see also* Lund Decl. ¶ 6. On that date, the fair market value of both vested and non-vested stock was $149.844 per share. L. Ex. C, D; *see also* Lund. Decl. ¶¶ 5-6. The number and exercise price per share were adjusted for the stock splits. *Id.*

On March 8, 2000, Lund executed an IRC Section 83(b) Election on 13,750 shares of non-vested stock.[5] L. Ex. E (Section 83(b) Election form); *see also* Lund Decl. ¶ 7. On October 16, 2000, Lund sold 11,000 shares of vested stock for $1,540,006.16. L. Ex. I; *see also* Lund Decl. ¶ 13. On April 10, 2001, Lund sold the remaining 19,000 shares for $303,984.87. L. Ex. J; *see also* Lund Decl. ¶ 14.

Plaintiffs' 2000 joint federal income tax return reported total income of $1,625,507, including the $1,540,006.16 realized from Lund's October 16, 2000 sale of 11,000 shares of Redback stock. K. Ex. 1 at 1. Because the stock was sold to Lund less than 12 months after she acquired it through the exercise of her option, the sale was determined by the IRS to be a

---

[5] Adjusted from 6,857 due to the stock split. *See* Lund Decl. ¶ 7.

"disqualifying disposition," under Section 421(b),[6] and the amount realized was required to be included as ordinary income. *Id.* at 2. Therefore, Plaintiffs reported a regular income tax liability of $674,453 on their 2000 return. *Id.* at 9. In addition, Plaintiffs reported an AMT liability of $620,213, resulting in a tax due of $1,294,666. *Id.* at 13-14.

Plaintiffs' 2001 federal income tax return reported regular income of $228,269. K. Ex. 2 at 1. Because deductions, primarily for state taxes, exceeded regular income, Plaintiffs reported no federal tax liability for 2001. *Id.* at 2. Plaintiffs reported their AMT, in the amount of $35,160, as their total tax liability for 2001. *Id.* Although Lund sold 19,000 Redback stock shares on April 10, 2001 for $303,948.87, Plaintiffs did not report any capital gain for regular income on their original 2001 tax return. K. Ex. 2. In addition, Plaintiffs failed to report $996 in dividends from other holdings on their 2001 tax return. *Id.*

On February 10, 2005, Plaintiffs filed an amended tax return for 2001,[7] together with a request for an examination and a claim for refund of the $35,160 paid. Ex. A-13 at 1-2. In the amended return, Plaintiffs reported an increase in capital gains of $281,422 and an increase in dividend income of $996. L. Ex. K. at 1-7; *see also* Ex. A-13.

On July 25, 2005, the IRS sent Plaintiffs a letter allowing $27,774 of the $35,160 refund claim and disallowing the $7,386 remainder. L. Ex. K at 1-19. Based on Plaintiffs' 2001

---

[6] Section 421(b) of the IRC provides:

> (b) Effect of disqualifying disposition. --If the transfer of a share of stock to an individual pursuant to his exercise of an option would otherwise meet the requirements of section 422(a) or 423(a) except that there is a failure to meet any of the holding period requirements of section 422(a)(1) or 423(a)(1), then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occurred. No amount shall be required to be deducted and withheld under chapter 24 with respect to any increase in income attributable to a disposition described in the preceding sentence.

26 U.S.C. § 421.

[7] Plaintiffs requested a "determination of whether: 1. [Capital] losses can be used to offset AMT gains from stock sale in previous years; 2. The AMT Negative Adjustments from the sale of options can be carried back to offset AMT Positive Adjustments from stock sales in previous years." Ex. A-13 at 1.

amended tax return, the adjustments to capital gains and dividend income increased Plaintiffs' adjusted gross income in 2001. *Id.* at 8-10. This automatically decreased their itemized deductions by $5,322 and exemptions by $4,408. *Id.* As a result, the IRS determined that Plaintiffs had a regular tax liability due for 2001 of $30,174, not $0, as reported on the original 2001 tax return. *Id.* at 3. Because Plaintiffs' 2001 regular tax liability increased, the IRS determined that the correct AMT liability should have been $7,386, instead of $35,160, as reported on Plaintiffs' 2001 original income tax return. *Id.* at 15. Because the AMT liability was less than the $30,174 regular tax liability, the IRS determined that Plaintiffs had no AMT liability in 2001. *Id.* at 13. The AMT credit available to offset Plaintiffs' 2001 regular income was determined to be $22,788, *i.e.*, $30,174 minus $7,386. *Id.* at 16. Applying the AMT credit, Plaintiffs had a 2001 regular tax liability of $7,386, *i.e.*, $30,174 minus $22,788. *Id.* at 3.

## II. PROCEDURAL HISTORY.

On October 7, 2005, Plaintiff filed a Complaint in the United States Court of Federal Claims alleging that Plaintiffs are "eligible for an [$2,543,051.13] AMT negative adjustment to be used in the calculation of their AMT credits of $284,422.37[,]" and "an AMT capital loss carryover of $2,540,051.13." Compl. ¶ 13; *see also id.* ¶ 8. Accordingly, the Complaint requests "a tax refund of $35,160 for 2001, plus interest, and attorneys fees, and costs, and such other relief to which Plaintiffs may be entitled." *Id.* ¶¶ 8, 17.

On January 3, 2006, the Government filed an Answer. On February 27, 2006, the parties filed a Joint Preliminary Status Report. On May 11, 2006, the court convened a telephone status conference. On May 31, 2006, the Government filed a Status Report. On August 18, 2006, the court convened a telephone status conference, during which the parties were directed to proceed with discovery. On October 3, 2006, the court issued a Scheduling Order.

On November 6, 2006, Plaintiffs filed: a Motion for Partial Summary Judgment and Proposed Findings in Support; the October 27, 2006 Declaration of Hendy J. Lund; and the October 31, 2006 Declaration of Brian G. Isaacson. On December 28, 2006, the Government filed: an Opposition and Cross-Motion with Proposed Findings in Support; a Response to Plaintiffs' Proposed Findings; and the December 28, 2006 Declaration of Benjamin C. King, Jr. On January 29, 2007, Plaintiffs filed: a Response to the Government's Cross-Motion and Reply to the Government's Opposition; the January 29, 2007 Declaration of Brian G. Isaacson; and a Response to the Government's Proposed Findings. On February 15, 2007, the Government filed a Reply. On April 18, 2007, the court convened a telephone status conference, during which counsel answered the court's questions regarding issues addressed in the briefs and Plaintiffs' counsel requested oral argument.

Pursuant to the court's April 18, 2007 and May 7, 2007 e-mail requests for clarification on several issues, on May 9, 2007, the Government filed a Motion for Leave to Submit

Calculations, which the court granted.[8] On May 10, 2007, Plaintiffs filed a Motion for Leave to Submit Calculations and the May 9, 2007 Declaration of Hendy J. Lund, which the court granted.[9] On May 10, 2007, the court held an oral argument.

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act authorizes the United States Court of Federal Claims to adjudicate tax refund claims. *See* 28 U.S.C. § 1491(a). As a prerequisite, however, a taxpayer must pay the full assessed federal tax liability and timely file a refund claim with the IRS stating the grounds for

---

[8] The Government's submission included AMT capital loss calculations for Plaintiffs' 2001 tax liability, designated as O. Ex. 1.

[9] Plaintiffs' submission included: spreadsheet assuming Section 83(b) election invalid – O. Ex. 2; spreadsheet assuming Section 83(b) election valid – O. Ex. 3; and the May 9, 2007 Declaration of Hendy J. Lund – O. Ex. 4.

the claim. *See* 26 U.S.C. §§ 6511(a),[10] 7422(a);[11] *see also Shore* v. *United States*, 9 F.3d 1524, 1526 (Fed. Cir. 1993) (holding that a tax refund claim must be dismissed if the "principal tax deficiency has not been paid in full"). If the claim is denied by the IRS and the taxpayer timely files suit, the United States Court of Federal Claims has jurisdiction to adjudicate the tax refund claim. *See* 26 U.S.C. § 6532(a); 28 U.S.C. § 1346(a)(1).

In this case, Plaintiffs fully paid the assessed income tax for 2001, properly filed a claim with the IRS, and timely brought suit in the United States Court of Federal Claims. *See* K. Ex. 2 (Plaintiffs' 2001 federal income tax return); Ex. A-13 at 1-2 (Plaintiffs' February 8, 2005 request for examination and refund claim); L. Ex. K at 1-2 (July 25, 2005 letter to Plaintiffs from the IRS partially disallowing the 2001 federal income tax return); *see also* Compl. ¶ 3; JPSR at 1; GSR at 1. Therefore, the court has jurisdiction to adjudicate Plaintiffs' federal tax refund claim for the 2001 tax year. Although the Complaint seeks $35,160, the IRS already has refunded $27,774 of that amount. *See* Compl. ¶¶ 8, 17; *see also* L. Ex. K. Therefore, at issue is Plaintiffs' claim for a refund of $7,386.

---

[10] Section 6511(a) of the IRC provides:

> (a) Period of limitation on filing claim.--Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid. Claim for credit or refund of an overpayment of any tax imposed by this title which is required to be paid by means of a stamp shall be filed by the taxpayer within 3 years from the time the tax was paid.

26 U.S.C. § 6511.

[11] Section 7422(a) of the IRC provides:

> (a) No suit prior to filing claim for refund.--No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422.

**B. Standard For Summary Judgment – RCFC 56(c).**

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." (citations omitted)). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id*. Therefore, to avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable factfinder to return a verdict for that party. *Id*. at 248-50.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing'—that is pointing out to the [trial court]—that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial.").

A trial court is required to resolve disputed factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment.").

The fact that both parties have moved for summary judgment does not relieve the trial court of its responsibility to determine the appropriateness of summary disposition. *See Stratos Mobile Networks U.S.A., L.L.C.* v. *United States*, 213 F.3d 1375, 1379 (Fed. Cir. 2000) ("[The

court] determines for itself whether the standards for summary judgment have been met." (citations omitted)). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *See California* v. *United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]"). The court must evaluate each party's motion on its own merits. *Id.*

**C. The Court's Resolution Of The Parties' Cross-Motions.**

**1. No Material Facts Are At Issue.**

Plaintiffs' November 6, 2006 Motion for Partial Summary Judgment requests the court to hold that, as a result of the April 10, 2001 sale of 19,000 stock option shares, Plaintiffs are entitled to a negative AMT adjustment, under Section 56(d)(2)(A)(i), equal to the difference between their AMT basis and regular tax basis, without the Section 172(c) and (d) and Section 1211 limitations on the deduction of capital losses. Pl. Mot. at 3, 19-20.[12] Plaintiffs also request the court to hold that Plaintiffs' March 8, 2000 Section 83(b) election was invalid, and therefore, Plaintiffs' 13,750 non-vested stock option shares should be taxed as they vest (on the fourth day of each month after January 1999), instead of in the 2000 tax year. *Id.* at 3.

The Government's December 28, 2006 Opposition to Plaintiffs' Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment asserts that there are no material facts at issue and requests the court to hold that Plaintiffs are not entitled to a tax refund for 2001. Gov't Mot. at 18.

Plaintiffs January 29, 2007 Response to the Government's Cross-Motion and Reply to the Government's Opposition asserts that material facts are at issue regarding the correct amount of Plaintiffs' 2001 tax liability, thus precluding summary judgment on the amount of any tax refund due. Pl. Resp. at 1. First, Plaintiffs assert that there is a material factual dispute regarding the amount of 2001 capital gains and dividend income, because the Government claims that Plaintiffs failed to report any increases. *Id.* (citing Gov't PF ¶ 15; Ex. A-13). The Government responds that Plaintiffs failed to report the additional capital gains and dividend income on the original 2001 tax return, but did report them on the amended tax return, which Plaintiffs do not dispute. Gov't Reply at 2. Accordingly, the court discerns no genuine issue of material fact regarding the amount of Plaintiffs' 2001 capital gains and dividend income.

---

[12] During oral argument, Plaintiffs' counsel represented that the specific amount of the claimed adjustment was: " assuming that the 83(b) election is valid, . . . the adjustment is a negative $2,824,000.00. Assuming that the 83(b) election is not valid, . . . the adjustment is [negative] $2,375,00.00." TR 20-21.

Second, Plaintiffs assert that there is a material factual dispute regarding their regular 2001 tax liability, because Plaintiffs determined this amount should be $26,884, instead of $30,174. Pl. Resp. at 2 (citing Ex. A-13; Gov't PF ¶ 15). The Government responds that there is no dispute, because the IRS's calculations were based on income that included Plaintiffs' additional capital gains and dividends, that Plaintiffs concede were not included in the original 2001 tax return. Gov't Resp. at 2-3.[13] The court discerns no genuine issue of material fact regarding Plaintiffs' 2001 regular tax liability, because this is a legal issue.

Third, Plaintiffs assert that there is a material factual dispute regarding their AMT liability, because the correct AMT liability for 2001 is $0, despite the Government's claim that the amount should be $7,386. Pl. Resp. at 2 (Ex. A-13; Gov't PF ¶ 16). The Government responds that the difference between these two amounts is based on Plaintiffs' legal contention that Section 1211, limiting the deductions of capital losses to $3,000, does not apply to the determination of AMT liability. Gov't Reply at 3-4. The court discerns no genuine issue of material fact regarding Plaintiffs' AMT liability, because this is a legal issue.

Fourth, Plaintiffs assert that there is a material factual dispute regarding the date on which Plaintiffs' stock option shares were sold. Pl. Resp. at 2 (citing Lund Decl. ¶ 9; Gov't PF Resp. ¶ 8). Plaintiffs contend that Section 83(b) does not authorize a transfer, until stock becomes vested. *See* Lund Decl. ¶ 9. The Government responds that a sale occurs when the options are exercised. Gov't PF Resp. ¶ 2-3. Again, the court discerns no genuine issue of material fact regarding Plaintiffs' transfer of stock shares, because this is a legal issue.

Finally, Plaintiffs assert that there is a material factual dispute regarding the correct AMT credit, because the credit available to offset Plaintiffs' 2001 regular tax liability is $26,886, instead of the $22,788 as the Government claims. Pl. Resp. at 2 (citing Ex. A-13; Gov't PF ¶ 17). The Government responds that this is a legal issue governed by the application of Section 1211, because the AMT credit is calculated by subtracting the taxpayers' tentative AMT from the regular tax liability for the applicable year. Gov't Reply at 4. The court discerns no genuine issue of material fact regarding Plaintiffs' AMT credit, because this is a legal issue.

---

[13] The Government explained that the parties' calculations differed, because the IRS applied reductions in itemized deductions, as mandated by Section 68(b) (applicable to adjusted gross income exceeding $145,000 in 2001), and exemptions, as mandated by Section 151(d) (applicable to adjusted gross income exceeding $150,000 in 2001). Gov't Reply at 3 (citing L. Ex. K at 8-9). Pursuant to Section 68(b), Plaintiffs' 2001 itemized deductions were reduced by $5,322. *Id.* Pursuant to Section 151(d), Plaintiff's 2001 exemptions were reduced by $4,408. *Id.*

**2. As A Matter Of Law, Alternative Minimum Tax Capital Losses Are Subject To Sections 172(c) and (d) and Section 1211.**

**a. The Internal Revenue Code's Provisions Concerning Regular Tax Capital Losses.**

In determining federal tax liability, a taxpayer's net operating loss is the excess of the deductions allowed by IRC Sections 1–476 that exceed gross income, subject to the exceptions, additions, and limitations set forth in Section 122(d). Pursuant to Section 172(b)(1)(A),[14] a taxpayer who incurs a net operating loss may carry back the loss to each of the two taxable years preceding the loss and may carry over the loss to each of the twenty taxable years following the loss. Under Sections 172(c) and (d), however, *capital losses may not be included in the net operating loss*. *See* 26 U.S.C. §§ 172(c), (d).[15] Instead, where capital losses exceed capital

---

[14] Section 172(b)(1)(A) of the IRC provides:

(b) Net operating loss carrybacks and carryovers.--

(1) Years to which loss may be carried.--

(A) General rule.--Except as otherwise provided in this paragraph, a net operating loss for any taxable year–

(i) shall be a net operating loss carryback to each of the 2 taxable years preceding the taxable year of such loss, and

(ii) shall be a net operating loss carryover to each of the 20 taxable years following the taxable year of the loss.

26 U.S.C. § 172.

[15] Sections 172(c) and (d) of the IRC, in relevant part, provide:

(c) Net operating loss defined.--For purposes of this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d).

(d) Modifications.--The modifications referred to in this section are as follows:

gains, Sections 1211 and 1212 allow the taxpayer to deduct up to $3,000 of the excess capital losses from ordinary income and carry over, to future tax years, any capital losses in excess of $3,000 that otherwise are not permitted to be deducted from ordinary income. *Id.* §§ 1211,[16] 1212.[17]

---

(1) Net operating loss deduction.--No net operating loss deduction shall be allowed.

(2) Capital gains and losses of taxpayers other than corporations.--In the case of a taxpayer other than a corporation--

(A) the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includable on account of gains from sales or exchanges of capital assets[.]

26 U.S.C. § 172.

[16] Section 1211 of the IRC, in relevant part, provides:

(b) Other taxpayers.--In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of--

(1) $3,000 ($1,500 in the case of a married individual filing a separate return), or

(2) the excess of such losses over such gains.

26 U.S.C. § 1211.

[17] Section 1212 of the IRC, in relevant part, provides:

(b) Other taxpayers.--

(1) In general.--If a taxpayer other than a corporation has a net capital loss for any taxable year--

(A) the excess of the net short-term capital loss over the net long-term capital gain for such year shall be a short-term capital loss in the succeeding taxable year, and

(B) the excess of the net long-term capital loss over the net short-term capital gain for such year shall be a long-term capital loss in the succeeding taxable year.

**b. Plaintiffs' Argument.**

Plaintiffs assert that "Congress clearly articulated its intention that different rules" apply to the calculation of regular tax net operating loss, as opposed to AMT net operating loss. Pl. Resp. at 5 (citing Section 56(a)(4) ("The alternative tax net operating loss deduction shall be allowed in lieu of the net operating loss deduction allowed under section 172.")). Therefore, Plaintiffs claim that they are entitled to a negative AMT "adjustment," because under Section 56(d)(2)(A)(i), the Sections 172(c) and (d) exclusion of capital losses from net operating loss and Section 1211 limitation on the deduction of capital losses simply do not apply to AMT "adjustments." Pl. Mot. at 20. Plaintiffs emphasize that the AMT negative adjustment is critical in computing the AMT credit under Section 53(c),[18] thereby reducing Plaintiffs' tax liability for

---

(2) Treatment of amounts allowed under section 1211(b)(1) or (2).--

(A) In general.--For purposes of determining the excess referred to in subparagraph (A) or (B) of paragraph (1), there shall be treated as a short-term capital gain in the taxable year an amount equal to the lesser of--

(i) the amount allowed for the taxable year under paragraph (1) or (2) of section 1211(b), or

(ii) the adjusted taxable income for such taxable year.

(B) Adjusted taxable income.--For purposes of subparagraph (A), the term "adjusted taxable income" means taxable income increased by the sum of--

(i) the amount allowed for the taxable year under paragraph (1) or (2) of section 1211(b), and

(ii) the deduction allowed for such year under section 151 or any deduction in lieu thereof.

26 U.S.C. § 1212.

[18] Section 53 of the IRC, in relevant part, provides:

(a) Allowance of credit.--There shall be allowed as a credit against the tax imposed by this chapter for any taxable year an amount equal to the minimum tax credit for such taxable year.

the 2001 tax year. *Id.* at 23. Initially, Plaintiffs claimed that they are entitled to carry back and/or carry over their 2001 AMT net operating loss to preceding and/or succeeding tax years. *Id.* at 25-26 ("When the AMT negative adjustment under I.R.C. § 56(d)(2)(A)(i) causes a negative alternative minimum taxable income, then the taxpayer is entitled to carryback an Alternative Tax Net Operating Loss ("AMT NOL") under I.R.C. § 56(d)"); *see also* Compl ¶ 13 (claiming Plaintiffs are eligible for "an AMT capital loss carryover of $2,540,051.13"). Plaintiffs, however, apparently withdrew this claim during oral argument:

| | |
|---|---|
| THE COURT: | Are you asking for the Court to determine what the carry-over should be, or the carry-back should be, from 2001 to preceding or succeeding years? |
| PLAINTIFFS' COUNSEL: | We [can't]. The reason for that is 2001 is the only year before the Court. |
| | * * * |
| | Then the whole question is: What goes on Line 9 as an AMT negative adjustment? That is what we are asking the Court to determine. |

---

(b) Minimum tax credit.--For purposes of subsection (a), the minimum tax credit for any taxable year is the excess (if any) of--

(1) the adjusted net minimum tax imposed for all prior taxable years beginning after 1986, over

(2) the amount allowable as a credit under subsection (a) for such prior taxable years.

(c) Limitation.--The credit allowable under subsection (a) for any taxable year shall not exceed the excess (if any) of--

(1) the regular tax liability of the taxpayer for such taxable year reduced by the sum of the credits allowable under subparts A, B, D, E, and F of this part, over

(2) the tentative minimum tax for the taxable year.

26 U.S.C. § 53.

> Once the Court makes the determination of what goes on Line 9, it will be an issue probably for a different court to determine whether or not that gets carried back.

TR 20-22.

As to the AMT negative adjustment claimed in this case, Plaintiffs concede that the language of Section 56(d)(2)(A)(ii)[19] requires the application of Section 172(c) to "tax

---

[19] Section 56(d) "Alternative tax net operating loss deduction defined," provides:

(1) In general.--For purposes of subsection (a)(4), the term "alternative tax net operating loss deduction" means the net operating loss deduction allowable for the taxable year under section 172, except that--

(A) the amount of such deduction shall not exceed the sum of--

(i) the lesser of--

(I) the amount of such deduction attributable to net operating losses (other than the deduction described in clause (ii)(I)), or

(II) 90 percent of alternative minimum taxable income determined without regard to such deduction and the deduction under section 199, plus

(ii) the lesser of--

(I) the amount of such deduction attributable to the sum of carrybacks of net operating losses from taxable years ending during 2001 or 2002 and carryovers of net operating losses to taxable years ending during 2001 and 2002, or

(II) alternative minimum taxable income determined without regard to such deduction and the deduction under section 199 reduced by the amount determined under clause (i), and

(B) in determining the amount of such deduction--

(i) the net operating loss (within the meaning of section 172(c) ) for any loss year shall be adjusted as provided in paragraph (2), and

preference" items, but argue that because Section 56(d)(2)(A)(i) does not directly address whether Section 172(c)[20] applies to tax "adjustment" items, Section 56(d)(2)(A)(i) must be interpreted in light of legislative history of the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 285 (1986). Pl. Mot. at 22. In support, Plaintiffs primarily rely on the Senate Report to the Tax Reform Act of 1986 that states:

> The structure for the alternative minimum tax on individuals generally is the same as under present law, except that adjustments are permitted in order to reflect the fact that certain deferral preferences (such as accelerated depreciation) cannot be treated simply as add-ons if total income is to be computed properly over time. For such preferences, the minimum tax deduction may in some instances exceed

---

> (ii) appropriate adjustments in the application of section 172(b)(2) shall be made to take into account the limitation of subparagraph (A).
>
> (2) Adjustments to net operating loss computation.--
>
> (A) Post-1986 loss years.--In the case of a loss year beginning after December 31, 1986, the net operating loss for such year under section 172(c) shall--
>
> (i) be determined with the *adjustments* provided in this section and section 58, and
>
> (ii) be reduced by the items of *tax preference* determined under section 57 for such year.
>
> An item of tax preference shall be taken into account under clause (ii) only to the extent such item increased the amount of the net operating loss for the taxable year under section 172(c).
>
> (B) Pre-1987 years.--In the case of loss years beginning before January 1, 1987, the amount of the net operating loss which may be carried over to taxable years beginning after December 31, 1986, for purposes of paragraph (2), shall be equal to the amount which may be carried from the loss year to the first taxable year of the taxpayer beginning after December 31, 1986.

26 U.S.C. § 56 (emphasis added).

[20] *See supra* note 15 (Section 172(c) applies the modifications in Section 172(d)).

> the regular tax deduction (*e.g.*, in the later years of an asset's life, thus insuring that basis will be fully recovered under both the regular and the minimum tax systems).

Pl. Mot. at 21 (quoting S. REP. NO. 99-313, pt. 1, at 521 (1986)); *see also* TR 11-12.

Plaintiffs reason that the AMT negative adjustment must be the *full* difference between the AMT basis and the regular tax basis, without Section 172(c) and (d) or Section 1211 limitations, because this ensures that the proper amount "'will be fully recovered under both the regular and minimum tax systems.'" Pl. Mot. at 21 (quoting S. REP. NO. 99-313, pt. 1, at 521) (emphasis added). Plaintiffs also contend that the Senate Report's statement that "'the minimum tax deduction may in some instances exceed the regular tax deduction,'" renders any interpretation limiting the AMT deduction to an amount less than the difference between the AMT basis and the regular tax basis a nullity. *Id.* at 22 (quoting S. REP. NO. 99-313, pt. 1, at 521 and citing *Equipment Co.* v. *Comm'r*, 297 U.S. 129, 134 (1936) ("A regulation which . . . operates to create a rule out of harmony with the statute, is a mere nullity.")).

In addition, characterizing incentive stock options as "deferral preferences," Plaintiffs argue that Congress imposed the AMT to accelerate the taxation of income, but allowed an AMT negative adjustment to prevent the AMT from being "'treated simply as add-ons if total income is to be computed properly over time.'" Pl. Mot. at 23 (quoting S. REP. NO. 99-313, pt. 1, at 521); *see also* Pl. Mot. at 24 (citing S. REP. NO. 445 (1988) (categorizing incentive stock options as deferral preference items, when they had previously been categorized as tax preference items)); *see also* TR 15-16.

At oral argument, Plaintiffs' counsel suggested that the following statutory interpretation of Section 56 was required in light of the legislative history:

> PLAINTIFFS' COUNSEL: [T]he other thing that we're asking is to be able to apply this statute in its proper sequence. . . . [U]nder [56(d)(1)(B)(i)], it says in determining the amount of such deductions, under (i), it says that you start out with a net operating loss within the meaning of 172(c) . . .
>
> Okay, then it says, for any loss here, it says that that portion shall be adjusted as provided in paragraph two. It's in paragraph two that you take into consideration the adjustment in the Congressional history that we've been discussing that says that basis shall be fully recovered. Now if you go down

> to 56(d), it's (d)(2)(A)(i). . .(i) says, be determined with the adjustments provided in this section. . . .
>
> Okay, well, instead of stock options, they are considered an adjustment in this section, because of 56(b)(3). So it says adjustments in this section.
>
> Now what's interesting is, they refer to an adjustment, meaning it's not a gain or a loss. It's simply an adjustment number. In this paragraph, this paragraph specifically is not subject to Section 172. So (i) is not subject to 172.
>
> Now in comparison, (ii) is subject to 172. Now if Congress had intended to make 172 subject to both what we have are (b)(i); we have (2)(a)(i) and we have (2)(a)(ii) -- if Congress had intended for 172(c) limitations to be subject to all three of those lines, they would have so stated. But instead, they very specifically excluded the 172(c) [and] 1211 adjustments from 56. It's (a)(2)(A)(i).

TR 25-26.

At oral argument, Plaintiffs' counsel also argued that the IRS Instructions, promulgated from 1998 to 2000, were consistent with Plaintiff's interpretation of Section 56, but the IRS Instructions promulgated in 2001 materially deviated from the prior Instructions.

PLAINTIFFS' COUNSEL: [T]his interpretation, in which the full recovery of bases is allowed, we feel is the only interpretation that is consistent with the congressional history; and it's also consistent with those instructions which, incidentally, were promulgated from 1998 to 2000.[21]

THE COURT: Have they changed the instructions since then?

---

[21] *See* I. Ex. Q (Department of the Treasury Internal Revenue Service, Form 6251, 2000, Alternative Minimum Tax – Individuals: "Use this line to report any AMT adjustment resulting from refiguring a gain or loss . . . Enter on line 9 the difference between the gain and loss, if any, reported for the regular tax and that figured for the AMT.").

| | |
|---|---|
| PLAINTIFFS' COUNSEL: | Yes, Your Honor, they changed the instructions in 2001 without going back to Congress. We felt that the Commissioner wanted to change the law that they -- |
| THE COURT: | They don't have to go back to Congress when they issue the instructions. |
| PLAINTIFFS' COUNSEL: | No, they don't but what happened is that issuance of the changed instructions for 2001[22] was such a departure from the instructions in 2000, and also for the years that preceded it; and we also feel that they are also a very significant departure from the congressional history. Therefore, we feel that they are invalidated. |

TR 18-19; *see also* TR 9-13; TR 60 (PLAINTIFFS' COUNSEL: "[T]he instructions themselves don't treat the adjustment as an AMT [net operating loss]. They treat the adjustment as the difference between the two gains and losses.").

**c. The Government's Response.**

The Government responds that Plaintiffs' AMT net operating loss deduction is equal to the regular tax net operating loss, as determined under Section 172, and thereafter *adjusted* in accordance with the provisions in Section 56(d)(2). Gov't Reply at 5 (emphasis added).[23] Accordingly, the Government contends that Plaintiffs' argument about the sequence for applying Sections 172(c) and (d) is irrelevant, because Plaintiffs had no regular tax net operating loss for 2001 and therefore, had no AMT net operating loss deduction. *Id.* (citing L. Ex. K at 3 (showing taxable income of $160,464)); *see also* TR 54-55.

---

[22] *See* I. Ex. R (Department of the Treasury Internal Revenue Service, Instructions for Form 6251, 2001, Alternative Minimum Tax – Individuals: "Use this line to report any AMT adjustment resulting from refiguring . . . Capital gain or loss . . . reported on Schedule D (Form 1040). . . . *The $3,000 capital loss limitation for the regular tax applies separately to any capital loss as refigured for the AMT*. See example below." (emphasis added)).

[23] *See* Section 56(d)(1) ("the term 'alternative tax net operating loss deduction' means the net operating loss deduction allowable for the taxable year under section 172, except that - - "); *see also* Section 56(d)(2)(A) ("the net operating loss of such year under section 172 (c) shall[.]").

Nonetheless, the Government contends that Section 1211's limitation on the deduction of capital losses applies to the AMT in the same way as the regular tax, because all IRC provisions, unless otherwise indicated, apply to the determination of the AMT. Gov't Mot. at 15 (citing 26 U.S.C. § 55[24] and Treas. Reg. § 1.55-1(a)[25]); *see also* TR 50-51.

The Government then argues that "Plaintiffs can not, and do not, cite any 'statute, regulation, or other published guidance' providing that [Section] 1211 does not apply for AMT purposes." Gov't Mot. at 15-16 (citing Treas. Reg. § 1.55-1(a)); *see also* TR 51-52. Accordingly, the Government advises that "every court that has addressed this issue has concluded that [Section] 1211 applies to the AMT." Gov't Mot. at 16.[26]

---

[24] Section 55(b)(2) of the IRC defines:

> Alternative minimum taxable income.--The term "alternative minimum taxable income" means the taxable income of the taxpayer for the taxable year --
>
> (A) determined with the adjustments provided in section 56 and section 58, and
>
> (B) increased by the amount of the items of tax preference described in section 57.
>
> *If a taxpayer is subject to the regular tax, such taxpayer shall be subject to the tax imposed by this section* (and, if the regular tax is determined by reference to an amount other than taxable income, such amount shall be treated as the taxable income of such taxpayer for purposes of the preceding sentence).

26 U.S.C. § 55 (emphasis added).

[25] Treas. Reg. § 1.55-1(a) provides:

> General rule for computing alternative minimum taxable income. Except as otherwise provided by statute, regulations, or other published guidance issued by the Commissioner, all Internal Revenue Code provisions that apply in determining the regular taxable income of a taxpayer also apply in determining the alternative minimum taxable income of the taxpayer.

26 C.F.R. § 1.55-1.

[26] *See Guzak* v. *United States*, 75 Fed. Cl. 304, 313 (2007) ("[L]imitations set forth by IRC §§ 172(c) & (d) and IRC §1211 apply to the AMT[.]"); *Merlo* v. *Comm'r*, 126 T.C. 205, 211 (2006) ("We find no statute, regulation, or other published guidance that purports to change the treatment of capital losses for AMT purposes. Therefore, we hold that the capital loss limitations of sections

In further support, the Government cites the Staff of the Joint Committee on Taxation ["Joint Committee"]'s "General Explanation of the Tax Reform Act of 1986":

> For most purposes, the tax base for the new alternative minimum tax is determined as though the alternative minimum tax were a separate and independent income tax system. In certain instances, the operation of the alternative minimum tax as a separate and independent tax system is set forth expressly in the Code.

* * *

---

1211 and 1212 apply in calculating a taxpayer's AMTI." (citations omitted)); *Spitz* v. *Comm'r*, T.C. M. 2006-168, 2006 WL 2356125 at *5 (2006) ("[T]he capital loss limitations of sections 1211(b) and 1212(b) apply in calculating a taxpayer's AMTI[.]"); *Montgomery* v. *Comm'r*, 127 T.C. 43, 64 (2006) (citing *Merlo* and holding that capital loss limitations of Sections 1211 and 1212 apply for purposes of calculating a taxpayer's AMTI); *Palahnuk* v. *Comm'r*, 127 T.C. 118, 123 (2006) ("While we agree with petitioners that the difference between a regular tax capital gain or loss and an AMT capital gain or loss must be taken into account in calculating a taxpayer's AMTI, we disagree with petitioners that the difference in this case is a net operating loss for the same reasons set forth in *Merlo*[.]); *Kadillak* v. *Comm'r*, 127 T.C. 184, 200 (2006) ("Petitioner argues he may carry back capital losses pursuant to section 1211 to reduce the amount of his AMTI for 2000 and that he may carry back an AMTNOL to reduce the amount of his AMTI for 2000. Similar arguments, by the same counsel, have been rejected in *Merlo*, . . . *Montgomery*, . . . and *Spitz*[.] Consistent with these cases, the Court finds petitioner may not carry back his AMT capital losses to reduce his AMTI in 2000, and petitioner may not claim an AMTNOL carryback to reduce his AMTI for 2000."); *In re Pavlosky* v. *United States*, 2006 WL 1867468 at *2 (Bankr. S.D. Tex. 2006), *aff'd,* Slip Op. No. 06-CV-2061 (S.D. Tex., Oct. 5, 2006) ("The Court simply does not see any 'negative adjustment' provision applicable to individuals that counteracts the rule in § 1211 limiting deduction of capital losses (net of capital gains) by individuals to $3,000."); *Norman* v. *United States*, Slip. Op. No. C 05-02059, 2006 WL 2038264 at *4 (N.D. Cal. 2006) (holding that the IRS's application of Section 1211 to taxpayer's AMT was "reasonable"); *Hernandez* v. *United States*, 450 F.Supp.2d 1112, 1125 (C.D. Cal. 2006) ("Plaintiffs do not cite any legal authority for the proposition that the limitations of I.R.C. § 1211 do not apply for AMT purposes. Because the IRS's interpretation is consistent with AMT statutory scheme, Defendant's inclusion of, and reference to, § 1211 limitations was not tantamount to a promulgation of a new rule, but rather with IRS's reasonable application of existing law.").

> In other instances, however, where no such express statement is made, Congress did not intend to imply that similar adjustments were not necessary. *Thus, for example, for [alternative] minimum tax purposes it was intended that section 1211 (limiting capital losses) be computed using [alternative] minimum tax basis.*

Gov't Mot. at 16 (quoting STAFF OF J. COMM. ON TAXATION, GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986 438 (J. Comm. Print 1987)) (emphasis added); *see also* TR 52.

Moreover, the Government argues that the "legislative history related to Section 402 of the Tax Relief and Health Care Act of 2006," a recent amendment to the AMT, makes clear that Section 1211's limitation on the deduction of capital losses applies to the AMT. Gov't Reply at 7-8; *see also* TR 52-53. As the Staff of the Joint Committee on Taxation explained:

> If the stock is sold for less than the amount paid for the stock, the loss may not be allowed in full in computing AMTI by reason of the $3,000 limit on the deductability of net capital losses. Thus, the excess of the regular tax over the tentative minimum may not reflect the full amount of the loss.

STAFF OF J. COMM. ON TAXATION, TECHNICAL EXPLANATION OF THE TAX RELIEF AND HEALTH CARE ACT OF 2006 84 fn.1102 ( J. Comm. Print 2006).[27]

---

[27] At oral argument, Government counsel argued that the context surrounding promulgation of the Tax Relief and Health Care Act of 2006 further evidences Congress' intent regarding the application of Section 1211:

> GOVERNMENT COUNSEL: Basically, what [the Tax Relief and Health Care Act of 2006] did is, it allowed taxpayers in the circumstance that Ms. Lund is in, who have substantial amounts of unused AMT credit, because you have to pay large amounts of AMT[,] and have been unable to recover it in subsequent tax years, because they did not have the income to offset the credit—this section allows them to recover that credit by deducting 20 percent a year over five years.
>
> So essentially, Ms. Lund will be able to utilize in full all of the unused AMT credit. When you pay AMT in one year, you can use that to offset your regular income tax liability in

Finally, the Government dismisses Plaintiffs' reliance on Senate Report No. 99-313, since it contains no reference to either Section 1211 or the limitation on the deduction of capital losses for AMT purposes. Gov't Mot. at 17 ("The Senate report does not directly support petitioner's interpretation of congressional intent, and we find no language supporting an inference of such intent."(quoting *Merlo*, 126 T.C. at 214 )).

**d. The Court's Resolution.**

The court has determined that Section 56(d)(2)(A)(i) does not allow a taxpayer to circumvent Sections 172(c) and (d) and Section 1211 by including capital losses in AMT adjustments for purposes of the AMT net operating loss. In light of Section 55 and Treas. Reg. §

---

> subsequent years; and we have all the computations here.
>
> What Congress did, which will be for years starting in 2007, is that regardless of whether your AMT credit computation allows you to use the unused AMT credit, you can take as a separate deduction 20 percent of that each year, starting in 2007 and running all the way forward. So she'll be able to take advantage of it.
>
> As . . . noted [in *Guzak*,] if, in fact, Congress already intended and the statutory scheme already provided that taxpayers could fully utilize their unused AMT credit by means of NOL carry-backs or by circumventing the $3,000 limitation on capital losses, there would be no need for Congress to have amended the statute in enacting this specific provision.

TR 53-54; *see also Guzak*, 75 Fed.Cl. at 314 ("[T]he court agrees with the government that § 402 of the Tax Relief and Health Care Act of 2006 and the corresponding Joint Committee Report confirm the government's reading of the IRC as it pertains to the treatment of AMT capital losses.").

1.55-1(a), the Tax Court's jurisprudence in this area,[28] and the United States Court of Federal Claims' recent decision in *Guzak*, Plaintiffs' reliance on legislative history that does not explicitly mention either Sections 172(c) and (d) or Section 1211 is not persuasive.[29] Therefore, the court concludes that the limitations of Sections 172(c) and (d) and Section 1211 apply to the deduction of AMT capital losses when calculating an AMT adjustment under Section 56(d)(2)(A)(i).[30]

Although Sections 1211 and 1212 specify that taxpayers may not carry back AMT capital losses to preceding tax years, but may carry over any excess of the $3,000 deduction of AMT capital losses to future tax years, Plaintiffs have claimed a tax refund in this case only for 2001. *See* 26 U.S.C. §§ 1211, 1212(b). Therefore, to the extent that Plaintiffs seek to adjudicate the amount of carryback and/or carryover to which they are entitled, the United States Court of Federal Claims does not have jurisdiction to resolve that issue. *See Consolidation Coal Co.* v. *United States*, 351 F.3d 1374, 1378 (Fed. Cir. 2003) ("[U]nder federal rules any court at any stage in the proceedings may address jurisdictional issues. Thus, even if the issue is not properly raised, this court sua sponte may consider all bases for the trial court's jurisdiction."); *see also* RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); TR 20 (Plaintiffs' counsel conceding that Plaintiffs "can't" ask the court to adjudicate carrybacks and/or carryovers to other tax years, because "2001 is the only year before the Court.").

---

[28] *See supra* note 26.

[29] Congress' intent is also found in the Joint Committee's General Explanation of the Tax Reform Act of 1986 and Joint Committee's Technical Explanation of the Tax Relief and Health Care Act of 2006, both acknowledging that Section 1211 applies to AMT capital losses. *See* STAFF OF J. COMM. ON TAXATION, GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986 438 (J. Comm. Print 1987); STAFF OF J. COMM. ON TAXATION, TECHNICAL EXPLANATION OF THE TAX RELIEF AND HEALTH CARE ACT OF 2006 84 fn.1102 (J. Comm. Print 2006); *see also Hutchison* v. *Comm'r*, 765 F.2d 665, 670 (7th Cir. 1985), *aff'g* T.C.M. 1984-55, 1984 WL 15364 ("[The Joint Committee Report] does not rise to the level of legislative history, because it was authored by Congressional staff and not by Congress. Nevertheless, such explanations are highly indicative of what Congress did, in fact, intend.").

[30] Plaintiffs' arguments regarding the invalidity of the 2001 IRS Instructions for Form 6251 as applied to AMT adjustments also are not persuasive. The IRS does not need the approval of Congress to change the Instructions. Moreover, the 2001 Instructions specifically reference the treatment of AMT capital losses provided for in Section 1211. *See* I. Ex. R (Department of the Treasury Internal Revenue Service, Instructions for Form 6251, 2001, Alternative Minimum Tax – Individuals: "The $3,000 capital loss limitation for the regular tax applies separately to any capital loss as refigured for the AMT. See example below.").

### 3. Plaintiffs' Section 83(b) Election.

#### a. Section 83 Governs the Alternative Minimum Tax On Incentive Stock Options.

For incentive stock options that meet the requirements of Section 422(a),[31] Section 421(a) provides that a taxpayer does not recognize income for regular income tax purposes, either upon the grant or exercise of an incentive stock option, but instead when there is a transfer of the stock. *See* 26 U.S.C. § 421(a).[32] Section 421 does not, however, apply to the AMT. *Id.* §

[31] Section 422(a) of the IRC provides:

(a) In general.--Section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of an incentive stock option if--

(1) no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 1 year after the transfer of such share to him, and

(2) at all times during the period beginning on the date of the granting of the option and ending on the day 3 months before the date of such exercise, such individual was an employee of either the corporation granting such option, a parent or subsidiary corporation of such corporation, or a corporation or a parent or subsidiary corporation of such corporation issuing or assuming a stock option in a transaction to which section 424(a) applies.

* * *

Such term shall not include any option if (as of the time the option is granted) the terms of such option provide that it will not be treated as an incentive stock option.

26 U.S.C. § 422.

[32] Section 421(a) of the IRC provides:

(a) Effect of qualifying transfer.--If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section 422(a) or 423(a) are met--

(1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;

(2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which section 424(a) applies, with respect to the share so transferred; and

56(b)(3).[33] Therefore, in computing a taxpayer's AMT liability, Section 83 governs when stock obtained through the exercise of an incentive stock option is to be taxed. *Id.* § 83.[34]

---

> (3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.

26 U.S.C. § 421.

[33] Section 56(b)(3) of the IRC provides:

> (3) Treatment of incentive stock options.--Section 421 shall not apply to the transfer of stock acquired pursuant to the exercise of an incentive stock option (as defined in section 422). Section 422(c)(2) shall apply in any case where the disposition and the inclusion for purposes of this part are within the same taxable year and such section shall not apply in any other case. The adjusted basis of any stock so acquired shall be determined on the basis of the treatment prescribed by this paragraph.

26 U.S.C. § 56(b).

[34] The general rules governing the recognition of gain, arising from a transfer of property in connection with performance of services and the right to an election, are found in Section 83(a) and (b) of the IRC:

> (a) General rule.--If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of--
>
> (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
>
> (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.
>
> (b) Election to include in gross income in year of transfer.--
>
> (1) In general.--Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income, for the taxable year in which such property is transferred, the excess of--

Pursuant to Section 83, upon the exercise of an incentive stock option, a tax is due on the difference between the value of the stock and the amount paid to exercise the option. *Id.* § 83. Where stock is subject to a substantial risk of forfeiture, as defined in Section 83(a), however, the transfer is not subject to tax, until the risk is removed. *Id.* § 83(a). Section 83(b), nevertheless, allows a taxpayer to elect to treat stock as subject to tax at the time of exercise, even though the stock is subject to a substantial risk of forfeiture. *Id.* § 83(b). As a result, the taxpayer may limit tax liability to the value of the stock on the date of exercise, instead of a potentially higher future value. *See* TR 41-42.

---

(A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over

(B) the amount (if any) paid for such property.

If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture.

(2) Election.--An election under paragraph (1) with respect to any transfer of property shall be made in such manner as the Secretary prescribes and shall be made not later than 30 days after the date of such transfer. Such election may not be revoked except with the consent of the Secretary.

26 U.S.C. § 83.

**b. The Validity Of Plaintiffs' Section 83(b) Election Is Irrelevant To The Court's Determination Of Plaintiffs' 2001 Tax Refund Claim.**

Plaintiffs argue that the March 8, 2000 Section 83(b) election was invalid, because it did not meet the prerequisites of Treas. Reg. §§ 1.83-3(a)(1) and (e).[35] Pl. Mot. at 5; *see also* Pl. Resp. at 15; 26 C.F.R. § 1.83-3(a)(1) ("For purposes of section 83 and the regulations thereunder, a transfer of property occurs when a person acquires a beneficial ownership interest in such property (disregarding any lapse restriction, as defined in § 1.83-3(i))."); *id.* § 1.83-3(e) ("For purposes of section 83 and the regulations thereunder, the term "property" includes real and personal property other than either money or an unfunded and unsecured promise to pay money or property in the future. The term also includes a beneficial interest in assets (including money) which are transferred or set aside from the claims of creditors of the transferor, for example, in a trust or escrow account.").

The Government responds that the March 8, 2000 election has no effect on Plaintiffs' tax refund claim for 2001, because of the 13,750 shares that were not vested on March 2, 2000, all but 1,250 shares became vested in 2000, and Plaintiffs' tax liability in 2000 is not at issue in this case. Gov't Mot. at 11; *see also* Gov't Reply at 8. Although the Government acknowledges that a reduction in the amount included in Plaintiffs' 2000 AMT would reduce Plaintiffs' 2001 AMT capital losses, the Government argues that the sole issue affecting whether Plaintiffs are entitled to a refund for the *2001 tax year* must be resolved with reference to the court's determination of the applicability of Section 1211 to AMT capital losses. Gov't Mot. at 11-12; *see also* Gov't Reply at 8. In fact, the Government posits that, if the court determines that Section 1211 applies to Plaintiffs' AMT net operating loss and Plaintiffs' March 8, 2000 election was invalid, Plaintiffs' 2001 AMT positive adjustments would increase by $51,015.63. Gov't Mot. at 12 n.8. As a result, Plaintiffs' 2001 tentative AMT would be increased by $12,753.90, Plaintiffs' 2001 AMT credit would be reduced by the same amount, and Plaintiffs' 2001 tax liability would be

---

[35] The requirements to effect a transfer for a Section 83(b) election are governed by Treas. Reg. § 1.83-2(a), which provides that a Section 83(b) election is not valid, unless there is a transfer, as defined in Treas. Reg. § 1.83-3.

Treas. Reg. § 1.83-2(a) provides in relevant part:

> *If property is transferred (within the meaning of § 1.83- 3(a)) in connection with the performance of services*, the person performing such services may elect to include in gross income under section 83(b) the excess (if any) of the fair market value of the property at the time of transfer (determined without regard to any lapse restriction, as defined in § 1.83-3(i)) over the amount (if any) paid for such property, as compensation for services.

26 C.F.R. § 1.83-2 (emphasis added).

*increased* by $12,753.90. *Id*. Accordingly, if the March 8, 2000 election was invalid, Plaintiffs would not be due a refund for the 2001 tax year. *Id*; *see also* TR 42-43.

Plaintiffs do not refute the Government's contention that the validity of the March 8, 2000 election is irrelevant to Plaintiff's 2001 refund claim, because they acknowledge that this issue is, or will shortly be, before the Tax Court as part of a refund claim for the 2000 tax year. *See* TR 22-23. Therefore, the court discerns that Plaintiffs are seeking to have the court rule on issues that affect their 2000 tax liability, even though Plaintiffs could not meet the jurisdictional prerequisite of paying their 2000 income tax. *Id.*[36]

Accordingly, the court does not need to determine whether Plaintiffs' March 8, 2000 Section 83(b) election was valid, because it will have no bearing on the only claim before this court.

| | |
|---|---|
| THE COURT: | Well, let me ask you a different question. Do I really need to make a legal determination about the [election] in this case? |
| GOVERNMENT COUNSEL: | No, the Court could find as a matter of fact that basically if the Section 1211 limitation applies, the Court could then determine that that renders basically whether the election is valid or not is not relevant or material to the refund at issue before this Court. |
| THE COURT: | Presumably that issue will come up in this other case. |
| GOVERNMENT COUNSEL: | I assume, Your Honor, because it would be relevant or material – |
| THE COURT: | In the 2000 tax year. |
| GOVERNMENT COUNSEL: | – in the 2000 tax year. Because basically what would happen is, if it's invalid, the amount of AMT that the taxpayer should |

[36] *See* TR 22-23 (PLAINTIFFS' COUNSEL: "There is also a related case in the tax court, or there soon will be a related case in the tax court. Because what happened with Redback, as you can see from this, the value of the shares had dropped off so quickly, and their losses were just so tremendous, that they simply weren't able to pay the alternative minimum tax. Right now, their liability is over a million dollars. The year 2000 will soon be before the tax court.").

> have reported in 2000 would be less. I think there's an analysis and a footnote in our brief, Your Honor, that points out exactly how much. I think it's roughly a $600,000 and something difference.
>
> The impact that would have on our year is that the AMT loss would be $600,000 and something less. Because of course, the taxpayer's basis would be $600,000 less. But the $3,000 limitation doesn't matter, because you'd be having instead of a roughly $2.4 million loss, of which you could only use $3,000, you'd have a roughly $1.8 million loss, of which you could only use $303,000.

TR 45-46; s*ee also* L. Ex. K at 1-19 (IRS calculations assuming that Sections 172(c) and (d) and Section 1211 apply to AMT capital losses and Plaintiffs' March 8, 2000 Section 83(b) election to tax 13,750 non-vested shares was valid); Gov't Mot. at 12 n.8 (Calculations assuming that Sections 172(c) and (d) and Section 1211 apply to AMT capital losses and Plaintiffs' March 8, 2000 Section 83(b) election was invalid).

Therefore, in light of the court's holding that Sections 172(c) and (d) and Section 1211 apply to Plaintiff's 2001 AMT capital losses when calculating an AMT adjustment under Section 56(d)(2)(A)(i), Plaintiffs are not entitled to a tax refund for 2001 whether or not the March 8, 2000 election was valid.

## IV. CONCLUSION.

To the extent that Plaintiffs claim carrybacks and/or carryovers to tax years other than 2001, the Clerk of the United States Court of Federal Claims is directed to dismiss such claims. *See* Compl ¶ 13 (claiming Plaintiffs are eligible for "an AMT capital loss carryover of $2,540,051.13"); *see also* Pl. Mot. at 25-26 ("When the AMT negative adjustment under I.R.C. § 56(d)(2)(A)(i) causes a negative alternative minimum taxable income, then the taxpayer is entitled to carryback an Alternative Tax Net Operating Loss ("AMT NOL") under I.R.C. § 56(d).").

For the reasons stated herein, the court denies Plaintiffs' November 6, 2006 Motion for Partial Summary Judgment and grants the Government's December 28, 2006 Cross-Motion for Summary Judgment. Accordingly, the Clerk of the United States Court of Federal Claims is directed to enter judgment in favor of the Government.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**